**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| iROBOT CORPORATION, *et al.*,[1] | ) Case No. 25-12197 (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

## DECLARATION OF KARIAN WONG
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Karian Wong, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am the Chief Financial Officer (the "CFO") of iRobot Corporation, a Delaware corporation (collectively with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases, the "Debtors", "iRobot" or the "Company"). I have served as CFO since December 2024, and, in that position, I oversee the Company's global finance organization, including financial planning and analysis, accounting, treasury, tax, internal audit and investor relations. I also manage the facilities organization and have in the past managed the global IT organization.

2.      I joined the Company in July 2017, and prior to serving as CFO, I led the Company's global accounting operation, during which time I was responsible for the Company's global accounting, tax and financial reporting. Before joining the Company, I served as Vice President and controller for Nuance Communications. I hold a Bachelor of Business Administration in accounting and finance from the University of Arizona.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: iRobot Corporation (9335); iRobot US Holdings, LLC (5237); and iRobot Holdings LLC (5307). For purposes of these chapter 11 cases, the Debtors' service address is 8 Crosby Drive, Bedford, MA 01730.

3.      As CFO, I have independently reviewed, have become generally familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, business, financial affairs, books and records, and the circumstances leading up to these chapter 11 cases.

4.      I submit this declaration (this "Declaration") to provide the Court and parties-in-interest with relevant background information regarding the Company, its capital structure, the circumstances that led to the commencement of these chapter 11 cases (collectively, these "Chapter 11 Cases"), and the Company's postpetition objectives, as well as in support of the Debtors' petitions and various pleadings requesting certain "first day" relief (collectively, the "First Day Motions").  I am authorized by the Debtors to submit this Declaration, and if called as a witness, I could and would testify competently to the facts set forth herein.

5.      The Company has commenced these cases to pursue and implement a streamlined and value-maximizing restructuring through the *Joint Prepackaged Chapter 11 Plan of iRobot Corporation and Its Debtor Affiliates* (as it may be amended, supplemented, restated, or modified from time to time, the "Prepackaged Plan"), filed concurrently on the date hereof.  The Prepackaged Plan is supported by the Company's first lien secured debt holder and largest unsecured creditor, the only creditor impaired under the chapter 11 plan, who was solicited prior to the commencement of these Chapter 11 Cases and voted to accept the Prepackaged Plan.  The proposed prepackaged restructuring transactions are the result of extensive arm's-length negotiations with the Company's largest stakeholders that will enable the Company to continue operating as a going concern around the globe, preserve hundreds of jobs, and eliminate its burdensome secured debt and cash interest expense.  This value-maximizing transaction, which will allow the Company to emerge from chapter 11 in a position to execute on its business plan in a competitive industry, was only obtainable due to the hard work and concessions given by the

Company's key stakeholders.  As set forth in the Scheduling Motion (as defined below), the Company is seeking to implement the prepackaged restructuring transactions in an efficient manner, and the Debtors have requested that the Prepackaged Plan be considered for confirmation no later than January 22, 2026, with the contemplated effective date occurring shortly thereafter.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and personnel, my review of business records maintained in the regular course of business and other relevant documents, my opinion based on my professional experience, or my discussions with the Debtors' advisors, including:      (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as restructuring co-counsel to the Debtors; and (b) Alvarez & Marsal North America, LLC ("A&M") as the Debtors' financial advisor and investment banker.  In making this Declaration, I have relied in part on information and materials that the Debtors, my colleagues at the Debtors, and the Debtors' advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration. Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is accurate to the best of my knowledge.

7.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition (such petitions, collectively, the "Petitions") for relief with the Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing these Chapter 11 Cases.  The Debtors have filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"). The Debtors intend to operate their business and manage their property as debtors in possession during the pendency of these Chapter 11 Cases. No trustee or examiner has been appointed in these Chapter 11 Cases and no statutory committees have been appointed at this time.

**Introduction & Case Overview**[2]

8.      iRobot, a leading consumer robotics company that designs and builds robots with a focus in intelligent home innovations, became the "go-to" company for robotic vacuums with its flagship product, the Roomba® vacuuming robot. Following the introduction of the Roomba robotic vacuum cleaner in 2002, iRobot sold over 50 million consumer robots worldwide to become a global, market-leading consumer robotics innovator with a strong presence in multiple major geographic regions worldwide.

9.      However, in recent years, iRobot has conceded significant market share with the influx of new product offerings in the robotic floorcare segment. In addition, the Company's performance has been impacted by, among other things, lower orders from retailers and distributors due in part to a decline in consumer sentiment and resultant spending, market headwinds, and expansive tariffs placed on countries where the Company's Robot Products have been historically manufactured and produced. As further detailed herein, the Company's management team implemented cost-saving operational measures to improve the Company's performance and curtail losses, but these strategic initiatives have been insufficient to counteract the Company's declining performance and losses.

---

[2]     Capitalized terms used but not defined in this section have the meanings ascribed to them elsewhere in this Declaration or the Prepackaged Plan, as applicable.

10.    In early 2025, the Company's board of directors (the "Board") initiated a review of strategic alternatives, including, but not limited to, exploring a potential sale or strategic transaction and refinancing its outstanding first lien secured debt.  As part of that process, the Board appointed an independent director, Mr. Neal Goldman, and established the Strategic Process Transaction Committee of the Board.  Shortly thereafter, the Company launched a comprehensive marketing process for its business and, ultimately, entered into exclusive negotiations with a potential purchaser.  However, in October 2025, the potential purchaser withdrew from the sale process.

11.    In response, the Debtors continued to explore all available strategic alternatives, including (i) a sale of the Debtors' assets or equity, (ii) a restructuring transaction with the Prior First Lien Lenders, and (iii) a potential wind down of the Company's operations. The Company determined that it was imperative to preserve the Company's liquidity to provide it with the necessary runway to work toward a value-maximizing transaction for the benefit of all interested parties. As a result, the Company determined, in consultation with the Company's advisors, that it was not in the best interests of the Company's stakeholders to make scheduled payments to Shenzhen PICEA Robotics Co., Ltd. (f/k/a Shenzhen 3irobotix Co., Ltd.) ("Picea Robotics"), its primary manufacturer of the Company's vacuuming robots.[3]  In connection with discussions with Picea Robotics regarding the Company's failure to make such scheduled payments under the Picea Supply Agreement, Picea Robotics expressed interest in potentially acquiring the Company.

---

[3]    Picea is party with iRobot to that certain Original Design Manufacturer and Supply Agreement (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "Picea Supply Agreement").

12.     Santrum Hong Kong Co., Limited ("Picea HK" and, together with Picea Robotics, "Picea"), a wholly owned subsidiary of Picea Robotics, purchased and assumed all of the outstanding First Lien Term Loans on November 24, 2025 pursuant to an Assignment and Assumption Agreement (such agreement, the "Assignment").   The purchase price for the Assignment was below the low-end of the Debtors' liquidation value.[4]  After several weeks of extensive, arm's-length and good faith negotiations prior to the Petition Date, the Debtors and Picea, in turn, entered into a Restructuring Support Agreement (the "RSA")[5] dated as of December 14, 2025, to implement a consensual, comprehensive prepackaged restructuring transaction, the terms of which are memorialized in the Prepackaged Plan.[6]  By virtue of the Assignment, Picea HK holds all First Lien Term Loans – the only secured funded debt against the Company – in addition to substantial general unsecured claims.  Picea HK is the only impaired creditor entitled to vote on the Prepackaged Plan.  Under the terms of the RSA and the Prepackaged Plan, Picea HK will equitize its First Lien Term Loans into 95% of the equity interests in the Company upon its emergence from chapter 11, and, in full and final satisfaction of Picea HK's approximately $74 million general unsecured claims against the Company arising under the Picea Supply Agreement, Picea HK will own 5% of the equity interests in the Company upon its emergence from chapter 11, resulting in the Company becoming wholly owned by Picea HK upon the effective date of the Prepackaged Plan.  Critically, the Prepackaged Plan will, among other things, allow all other general unsecured creditors to be paid in full or otherwise remain unimpaired unless otherwise

---

[4]    The Debtors' hypothetical liquidation value is set forth in Exhibit E to the Disclosure Statement (as defined below).

[5]    The RSA is attached as Exhibit B to the Disclosure Statement (as defined below), filed contemporaneously herewith.

[6]    iRobot's international affiliates are not Debtors in these proceedings and such affiliates' international operations are unaffected by the commencement of these Chapter 11 Cases unless otherwise described herein.

agreed to with relevant parties, will not impact the Debtors' customers or contract counterparties, and positions the Company upon emergence to execute on its business plan.[7]

13.      The Prepackaged Plan, together with a disclosure statement (as may be amended, supplemented, restated, or modified from time to time, the "Disclosure Statement"), has been solicited prior to the commencement of these Chapter 11 Cases and unanimously accepted by the impaired classes needed to confirm such Plan.  The Company believes that consummation of the Prepackaged Plan represents the best path forward for the Company to maximize the value of its business for the benefit of all of its stakeholders, maintain its operations and preserve hundreds of jobs and trade relationships.  To reduce any potential prejudicial impact of these proceedings on the Debtors' business operations, the Company intends to exit these Chapter 11 Cases as quickly as possible, and no later than February 21, 2026.  Notably, the Company is not seeking to shorten any applicable notice periods under the Bankruptcy Code, Bankruptcy Rules, or Local Rules in pursuing confirmation of the Prepackaged Plan. A projected case timeline, indicating significant confirmation-related deadlines, is set forth below:[8]

| Event | Date/Deadline |
|---|---|
| Voting Record Date | December 13, 2025 |
| Commencement of Solicitation | December 14, 2025 |
| Plan Voting Deadline | December 14, 2025 at 11:59 p.m. (Prevailing Eastern Time) |
| Petition Date | December 14, 2025 |
| Mailing of Combined Notice and Notice of Non-Voting Status | Within two (2) business days, or as soon as reasonably practicable, after entry of the Proposed Order |
| Publication Deadline | Twenty-one (21) days prior to the Combined Hearing |

---

[7]    As part of the overall restructuring, the Company was able to negotiate and obtain material concessions from several trade partners prior to commencement of these Chapter 11 Cases and, as a result of those efforts, the Debtors' business will benefit from favorable contract terms on a go forward basis.

[8]    Capitalized terms used but not otherwise defined in the chart below have the meanings given to such terms in the Scheduling Motion (as defined below).

| Event | Date/Deadline |
|---|---|
| Deadline to Object to Assumption of Executory Contracts and Unexpired Leases | Twenty-one (21) days after service of the Combined Notice and Notice of Non-Voting Status |
| Plan Supplement Filing Deadline | January 8, 2026 |
| Plan/Disclosure Statement Objection Deadline and Deadline to Return Release Opt-In Forms | January 15, 2026 at 4:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Reply Deadline and Deadline to File Proposed Confirmation Order and Opt-In Report | January 20, 2026 at 12:00 p.m. (Prevailing Eastern Time), or two (2) business days prior to the Combined Hearing |
| Combined Hearing | January 22, 2026 or such other date as the Court may direct |

14.     The Debtors seek the relief set forth in the First Day Motions (defined below) to minimize any adverse effects the commencement of these Chapter 11 Cases might otherwise have on the Company's business and to ensure continued ordinary course business operations during the pendency of these proceedings.  I am familiar with the contents of the Petitions and the First Day Motions, including the exhibits attached thereto, and believe that the relief sought is necessary to avoid immediate and irreparable harm to the Debtors' estates and, indeed, is essential to preserve and maximize value thereof.

15.     **Part I** of this Declaration describes the Debtors' business, including their history, business operations, organizational structure, and prepetition capital structure. **Part II** describes the events and circumstances leading to the commencement of these Chapter 11 Cases, as well as the Assignment and execution of the RSA.  **Part III** describes the Prepackaged Plan.  Finally, **Part IV** affirms and incorporates the facts that support the relief requested in the First Day Motions and addresses the Debtors' proposed use of cash collateral in more particular detail.

## I.      General Background

### A.      The Debtors' History

16.      iRobot is a leading consumer home devices company that designs and builds robotic vacuum cleaners with a focus on home innovations.  For over thirty years, iRobot has been a leader in robotic floor care innovation, focusing on creating thoughtful home innovations that enhance the lives of millions worldwide.  iRobot's portfolio includes home vacuum devices featuring proprietary technologies for connected homes, advanced cleaning, mapping, and navigation.

17.      In 1990, three Massachusetts Institute of Technology roboticists cofounded IS Robotics, which, eventually, became iRobot.  In its early years, the Company focused on defense and space work, developing Ghengis, a robot designed for space exploration in 1991, and five years later, Ariel, a robot that detects and eliminates mines in surf zones.  In 1998, iRobot won a Defense Advanced Research Projects Agency contract to build a tactical mobile robot, leading to the development of iRobot Packbot, which was used to search the World Trade Center after the September 11, 2001 terrorist attacks in New York, along with gathering data at the Fukushima Daiichi nuclear disaster site.  iRobot also created a robot known as the "Seaglider" that helped discover pools of oil during the Deepwater Horizon oil spill.

18.      After a decade of research and development aimed at producing an autonomous cleaning robot, in 2002 the Company launched its flagship product and first robot manufactured for domestic use, the Roomba® vacuuming robot (the "Roomba").  The Roomba did not require a human to control and was one of the earliest versions of an autonomous vacuuming robot.  Roomba was an instant success with consumers and had tremendous traction in pop culture, and Roomba and iRobot quickly became synonymous with consumer robotic household cleaning.

Over 2 million Roombas were sold during its first two years on the market.  Expanding on Roomba's success, the Company introduced the Scooba, the Roomba's mop counterpart, in 2005.[9]

19.    With the success of the Roomba, iRobot became the "go-to" company for robotic vacuums.  Indeed, as of December 2024, six of the top ten robotic vacuum cleaners ("RVCs") on the Amazon.com e-commerce platform were Roombas.  In the last nearly quarter century, more than 50 million consumers worldwide have purchased a Roomba.  In fiscal year 2024, iRobot held approximately 42% of the U.S. market share, approximately 65% of the Japanese market share, and approximately 16% of certain key markets within the Europe, Middle East, and Africa (known as "EMEA") market for automated domestic robots.  In fiscal year 2024, iRobot generated approximately $682 million in total revenue.

**B.    The Debtors' Business**

20.    The Debtors, including their non-Debtor foreign subsidiaries, design, have manufactured, market, and sell robotic floor care products and other home innovations and accessories (the "Robot Products") and provide related services in connection therewith (the "Related Services").

***i.    Robot Products***

21.    As of the Petition Date, the Debtors offer the following Robot Products: (a) the Roomba, (b) the Braava, (c) the Roomba Combo, and (d) related accessories.

***(a)    Roomba***

22.    The Roomba is the leading domestic robotic floor care product, with sales surpassing 50 million units worldwide.  Introduced to the market nearly twenty-five years ago, the Roomba now comes in various different iterations and has been improved over the years with

---

[9]    Eventually, iRobot would introduce a new mopping robot, named Braava® ("Braava") which would replace the Scooba.

myriad enhanced features.  Among other things, the Company now offers Wi-Fi-enabled Roombas featuring increased suction power, elongated battery life, enhanced navigation capabilities, and the ability to automatically empty their debris bins into an iRobot AutoEmpty Dock.  In addition, Roombas can now leverage iRobot's cutting edge and innovative technologies through features such as Dirt Detective (which automatically prioritizes the dirtiest rooms and selects the ideal settings for each job) and SmartScrub (which provides for a deeper cleaning) on iRobot's proprietary robot, cloud, and application infrastructure ("iRobot OS").

### (b) *Braava*

23.     Released in 2013, Braava is an automatic floor-mopping robot designed for hard-surface floors.  iRobot has made various improvements to the Braava since its initial release in 2013.  Like the Roomba, the Braava robots are Wi-Fi enabled and also powered by the iRobot OS platform.  While iRobot has discontinued its Braava sales in favor of the more sophisticated Roomba Combo (discussed below), it nonetheless plans to continue selling accessories and consumables for the Braava, such as cleaning solution, washable and disposable mopping pads, and replacement tanks and batteries until its inventory is depleted.

### (c) *Roomba Combo*

24.     The Roomba Combo is a WiFi-enabled robot that both mops and vacuums, thereby combining the services provided by the Roomba and the Braava into a single Robot Product.  iRobot first introduced the Roomba Combo in late 2022 and has released various improved versions of the Roomba Combo in the three years since.  Among other things, some models of Roomba Combos have the ability to automatically wash and dry their own mop pads using an iRobot AutoWash Dock, and offer improved suction power and battery life, enhanced navigation capabilities, and access to features such as Dirt Detective and SmartScrub.

*(d)*    ***Related Accessories***

25.    To ensure that the Robot Products optimally perform, iRobot also sells certain related accessories and consumables, including various docking systems (such as the AutoClean Dock and the AutoWash Dock), replacement dirt disposal bags, mop pads, floor cleaning solution, filters, brushes and other replacement parts.  In the near future, iRobot plans to begin selling new premium accessories and personalization options as well.

***ii.***    **Robot Services**

26.    As described in more detail in the Customer Programs Motion, iRobot offers certain Related Services which enhance the efficacy of the Robot Products and bolster customers' brand loyalty and confidence in the Robot Products' reliability.  The Related Services include, among other things:  (a) iRobot OS and the related iRobot Home App (for older models) and Roomba Home App (for newer models sold after March 2025) and features, such as Dirt Detective and SmartScrub; (b) iRobot's standard one-year warranty on Robot Products, which customers can extend, for a fee, for an additional one or three years; (c) iRobot's Trade-In Program, which provides certain customers with the option to send their older model Robot Product back to the Company in return for a credit on their purchase of new Robot Product; (d) the iRobot Select Program, which provides certain customers with free replenishments on accessories and the right to upgrade their Robot Product after 36 months of participation in the program, subject to their payment of certain fees;[10] and (e) other general customer service and support services.

---

[10]    The iRobot Select Program is no longer open to new subscribers, but the Company continues to maintain approximately 23,000 legacy memberships.

### iii.    Robot Design & Technology

27.    Research and development ("R&D"), which has historically driven evolving production and functionality for the Company's robots, is a key component of iRobot's business.  In 2024, the Company launched iRobot Labs, an innovation center focused on developing and improving the Debtor's substantial intellectual property ("IP") holdings.  Through its commitment to R&D, iRobot continues to innovate across several core technology areas as it enhances its existing Robot Products, mobile applications, and general software.

### iv.    Intellectual Property

28.    iRobot has built an extensive patent estate, comprised of approximately 1,825 U.S. and foreign patents, and approximately 160 patent applications pending worldwide, including patents for (a) RVC technologies, (b) outdoor technologies, (c) wet cleaning technologies, and (d) navigation technologies.

29.    The Company's U.S. patent estate consists of approximately 570 U.S. patents, with expiration dates ranging from 2026 to 2044 and approximately 72 pending patent applications.

30.    The Company's non-U.S. patent estate consists of approximately 1,250 patents, with expiration dates ranging from 2026 to 2044, and approximately 90 pending patent applications, including in the following jurisdictions: Australia, Belgium, Brazil, Canada, China, France, Germany, Great Britain, Ireland, Israel, Italy, Japan, Korea, Liechtenstein, Luxembourg, Malaysia, Monaco, Singapore, Spain, Switzerland, and Taiwan.  The Company's IP is collateral securing the First Lien Term Loans.

31.    The Company has also extensively trademarked many of its robots and names, including, among others, iRobot, Roomba, and Braava.  Currently, iRobot is registered in 70 countries, and Roomba is registered in 65 countries.

### *v.* **Manufacture and Supply**

32.     While iRobot does its own R&D and designs its Robot Products, the Company utilizes third party manufacturers (the "<u>Contract Manufacturers</u>") to produce the Robot Products in accordance with iRobot's specifications.  Picea Robotics is the primary manufacturing partner for the Company's vacuuming robots.  Picea Robotics, as well as other third parties, also manufacture accessory products for the vacuuming robots.  The Contract Manufacturers generally manufacture the Robot Products in Vietnam and China, and then ship the Robot Products to the jurisdictions in which iRobot sells and distributes such inventory.

### *vi.* **Distribution Channels**

33.     iRobot sells and distributes its products through three different channels: (a) retail (including online), (b) direct-to-consumer ("<u>DTC</u>") from iRobot's website, and (c) third party distributors.

### *(a)* ***Retail (Including Online)***

34.     A substantial portion of iRobot's online strategy is driven through Amazon.com with strong brand visibility support via targeted marketing.  The Company also has strong relationships with a network of blue-chip, big box retailers (collectively, the "<u>Retailers</u>") in the U.S., Canada, Japan, and Europe, including Best Buy, Costco, Sam's Club, Target, Yamada Denki Co., Ltd., Canadian Tire Corporation, K's Denki Group, EDION Corporation, and Walmart. All major brick and mortar retailers in the U.S. have their own ecommerce sites that support iRobot's products.  iRobot generally sells its Robot Products directly to such Retailers which, in turn, stock inventory to sell on their ecommerce sites or in their brick-and-mortar locations.  In fiscal year 2024, approximately 63% of iRobot's $682 million of revenue came from sales generated at such large Retailers, approximately 35% of which represented sales generated on Amazon.com.

(b)    **DTC**

35.    iRobot's website and mobile application provide a strong DTC platform with an attractive margin profile.  In 2020, iRobot identified DTC as a core strategic long-term priority – enabling deeper customer relationships, driving cross- and up-sell, improving margins, and increasing share.  To support its growing DTC channel, iRobot has a dedicated digital and marketing team which, among other things, (a) focuses on engaging prospects and customers to increase brand awareness, (b) educates customers and prospects about the Robot Products and helps customers choose the best option for a designated use, (c) enables easy purchasing, (d) helps customers through post-purchase onboarding, (e) assists customers with finding and buying related accessories, and (f) ensures customers optimally utilize Robot Products through their lifetime.  In fiscal year 2024, DTC sales constituted approximately 25% of iRobot's $682 million of revenue.

(c)    **Third Party Distributors**

36.    iRobot leverages third party distributors in smaller retail markets outside of core regions to maximize global reach.  Certain markets, including Scandinavia, Italy, Poland, Latin America, and various countries in Asia, are managed by third party distributors to whom iRobot directly sells its products.  The Company's distributor partners, who are supported with a dedicated iRobot international sales and marketing team located primarily in Spain and the U.K., resell Robot Products to retail stores in their respective countries.  The distributor channel enables iRobot to compete in emerging markets where traditional distribution methods, such as DTC or online, are less effective.  In the 2024 fiscal year, approximately 12% of iRobot's $682 million of revenue came from third party distributor sales.

*vii.*    **Employees**

37.    As of the Petition Date, the Debtors directly employ approximately 274 individuals, of which 266 are compensated on a salaried, exempt basis and 8 are paid on an hourly

basis (collectively, the "Employees").  Approximately six of the Debtors' Employees are based in Canada.  Moreover, the Debtors supplement their workforce by contracting with independent contractors (the "Contractors") and retaining temporary workers (collectively with the Contractors and the Employees, the "Workforce") to support the organization.[11]  The Workforce performs a wide variety of scientific, corporate, and administrative functions, including, among other things: (a) R&D; (b) sales, marketing and commercial strategy; (c) finance, accounting, legal, and human resources functions; (d) billing and revenue collection services; (e) technology support and information technology services; and (f) business analysis and managerial support services.

>    **C.    The Debtors' Organizational Structure**

38.    An organizational chart of iRobot Corporation and its direct and indirect subsidiaries, which includes the three Debtors, is attached hereto as **Exhibit A**.

39.    The Company was originally incorporated in California in August 1990 under the name IS Robotics, Inc., and reincorporated as IS Robotics Corporation in Massachusetts in June 1994.  iRobot, under the name iRobot Corporation, was incorporated in Delaware in 2000. On November 9, 2005, iRobot became a publicly traded corporation on NASDAQ under the ticker symbol IRBT.

40.    The Company has fifteen foreign subsidiaries that are not Debtors in these Chapter 11 Cases.  The Company, along with its non-Debtor foreign subsidiaries, operate a global business with a global client base.  The non-Debtor foreign entities generally distribute inventory locally to their retailers, distributors and consumers through the DTC channel.  Certain non-Debtor

---

[11]    The Debtors' foreign non-debtor subsidiaries employ approximately 200 additional individuals based outside of the U.S. in countries such as China, the United Kingdom, France, and Spain.

foreign entities also provide services, such as sales and marketing, research and development, customer support, and supply chain and procurement services, for iRobot.

     **D.**     **The Debtors' Capital Structure**

     *i.*     **First Lien Term Loans**

     41.     On July 24, 2023, the Company entered into a Credit Agreement (as amended, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement") by and among iRobot Corporation, as borrower, each lender from time to time party thereto (the "Prior First Lien Lenders")[12] and TCG Senior Funding L.L.C., an affiliate of The Carlyle Group, as administrative agent and collateral agent (the "Prior First Lien Agent" and, together with the Prior First Lien Lenders, the "Prior First Lien Secured Parties"), providing for a $200.0 million senior secured term loan credit facility (the "First Lien Term Loan Facility" and, the term loans outstanding thereunder, the "First Lien Term Loans").[13]  Pursuant to the Assignment, the outstanding First Lien Term Loans were assigned by the Prior First Lien Lenders to Picea HK, and on November 24, 2025, Picea HK replaced the Prior First Lien Agent as successor administrative and collateral agent (in such capacities as lender and administrative and collateral agent under the First Lien Credit Agreement, the "First Lien Secured Parties") upon the Prior First Lien Agent's resignation.

     42.     The maturity date under the First Lien Credit Agreement is July 24, 2026. The Company's obligations under the First Lien Term Loans are secured by a first-priority lien in favor of the First Lien Secured Parties on substantially all tangible and intangible property and

---

[12]    The Prior First Lien Lenders were funds, accounts or investment vehicles affiliated with, or managed by funds affiliated with, The Carlyle Group.

[13]    Debtor iRobot US Holdings, LLC is an obligor under the First Lien Credit Agreement, along with certain non-Debtor affiliates located in the United Kingdom, Japan, France, Germany, and Spain, respectively.

pledges of equity in certain of the Debtors, in each case, subject to certain exceptions, limitations, and exclusions, as set forth in the First Lien Credit Agreement and the ancillary documents thereto.

43.     As of the Petition Date, approximately $190 million in principal and interest is outstanding under the First Lien Term Loan Facility.  The First Lien Secured Parties have full recourse rights against the Company for these obligations.

### ii.     Common Stock

44.     Debtor iRobot Corporation has a single class of outstanding common stock (the "Common Stock") which currently trades on NASDAQ.

45.     As of the Petition Date, approximately 31,911,259 shares of Common Stock and 0 shares of preferred stock were issued and outstanding.

## II.     Events Leading to Chapter 11

### A.     Adverse Market Conditions and Liquidity Constraints

46.     The Company has faced challenges arising from external market conditions, including increased competition in the industry, rising inflation and expansive tariffs placed on countries where the Robot Products have been historically manufactured and produced.  As the Company's liquidity position suffered, it, in turn, initiated a strategic alternative review to explore potential sale or restructuring opportunities.  As detailed herein, the Prepackaged Plan is the culmination of the Company's efforts to assess, pursue and exhaust such strategic opportunities.

### i.     Alternative Products

47.     The Debtors' market has become increasingly competitive and the Company's market share has declined in the last decade leading up to the Petition Date.  In response to growing competition, the Company lowered the prices of its Robot Products (relative to their production costs) and has made substantial investments in the R&D necessary for certain key product upgrades, including the incorporation of laser imaging and detection technology.

While these changes helped reinvigorate consumer demand for the Robot Products, the Company's near-term profit margins and liquidity suffered.

### ii.    Macroeconomic Headwinds

48.    Various macroeconomic headwinds, including inflation, high interest rates, and tariffs, further diminished iRobot's near-term liquidity position.

49.    *First*, beginning in 2021, rising inflation related to the COVID-19 pandemic substantially increased the costs of operating iRobot's business.  Among other things, the Company experienced increased vendor, Contract Manufacturer, freight, and delivery costs, which further compressed the Company's profit margins.

50.    *Second*, in an effort to combat inflation in the U.S., the U.S. Federal Reserve increased its target federal funds rate 11 times from March 2022 to July 2023, with an aggregate increase of 5.25% during that period.[14]  The resulting high-interest rate environment has largely persisted as of the Petition Date,[15] constraining the Company's ability to bolster its liquidity by accessing capital markets.

51.    *Third*, in February 2025, the U.S. government announced expansive tariffs, including a 10% baseline tariff on imports from all countries and higher rates for imports from certain countries, most notably including a 46% tariff on imports from Vietnam, where the Debtors' U.S.-bound Robot Products are currently produced.[16]

---

[14]    From March 2022 to July 2023, the U.S. Federal Reserve increased its target federal funds rate, in aggregate, from:  (a)  0% to 0.25%; to (b) 5.25% to 5.50%.

[15]    In late 2024, the U.S. Federal Reserve decreased its target federal funds rate 3 times, with a relatively modest aggregate decrease of 1.00%.  As of the Petition Date, the target federal funds rate is 3.75% to 4.00%.

[16]    The U.S. government ultimately delayed the imposition of the 46% tariff on imports from Vietnam until July 9, 2025, to allow time for a potential negotiated resolution of ongoing trade disputes.

52.     In July 2025, Vietnam and the United States reached a provisional understanding to reduce impending U.S. tariffs on goods imported from Vietnam to 20%, while maintaining a higher 40% tariff rate on products deemed "trans-shipped" through Vietnam from third countries.

53.     In anticipation of tariff uncertainty with China, the Company relocated production of its U.S.-bound robots outside of China, mainly to Vietnam.  However, the Company's accessories are still sourced from manufacturers in China, including Picea Robotics. The Company has been working to relocate manufacturing hubs for these accessories outside of China.

54.     The 20% baseline tariff currently applies to the Company's U.S.-bound products from Vietnam, with the potential for significant increases to applicable tariff rates at any time.  These tariffs are paid by the Debtors, not their Contract Manufacturers.  The current uncertainty regarding long-term tariff rates has undermined the Debtors' ability to forecast and plan their long-term operations.

55.     The Company estimates that the imposition of these new and additional tariffs will cause an increase in tariff costs of more than $23 million during fiscal year 2025.

**B.     iRobot Elevate**

56.     Following the termination of the Merger Agreement (as defined below), on January 29, 2024, iRobot announced a five-point operational restructuring plan to more closely align iRobot's cost structure with near-term revenue expectations, including through the following financial and strategic initiatives:  (a) achieving gross margin improvements through the execution of agreements with joint design and contract manufacturing partners on more beneficial terms that provide significant reductions in cost of goods sold; (b) reducing R&D expenses through increased offshoring of non-core engineering functions to lower-cost regions; (c) centralizing global

marketing activities and consolidating agency expenditures to reduce sales and marketing expenses while seeking efficiencies in demand generation activities to drive sales more cost effectively; (d) evaluating and streamlining the Company's global real estate footprint through additional subleasing at its corporate headquarters[17] and the elimination of offices and facilities in smaller, underperforming geographies; and (e) focusing the Company's product roadmap on core value drivers within robotic floorcare market, and pausing all work related to non-floorcare innovations.

57.    During the second quarter of fiscal year 2024, the Company launched a new strategy focused on growth ("iRobot Elevate").  iRobot Elevate centers on 1) improving the Company's financial performance, 2) increasing consumer focus to elevate the iRobot brand, 3) bringing innovative products to market in an entirely new and more profitable way, 4) continuing the Company's operational and organization improvements, and 5) developing and retaining the best talent.

58.    The Company largely completed the framework for the iRobot Elevate strategy by the end of 2024, and the Company's workforce was reduced by approximately forty percent.  In 2025, the Company completed the launch of the largest and most comprehensive lineup of new products in the Company's history.  While iRobot Elevate has resulted in improved gross margins, substantial cost savings, and increased operating income, its impact has been counteracted by, among other things, the macroeconomic factors discussed above, especially the recent imposition of tariffs on goods imported to the U.S. from Vietnam.

---

[17]    As part of the overall restructuring, the Company was able to renegotiate favorable terms with the landlord to its corporate headquarters lease prior to commencement of these Chapter 11 Cases and, as a result of those efforts, the Debtors' business will benefit from such terms on a go forward basis.

### C.    Prepetition Marketing Process

59.    On August 4, 2022, iRobot entered into an Agreement and Plan of Merger (as amended or otherwise modified from time to time, the "Merger Agreement") with Amazon.com, Inc., ("Amazon"), and Martin Merger Sub, Inc., an indirect wholly owned subsidiary of Amazon ("Merger Sub"), providing for, among other things, Amazon's acquisition[18] of iRobot for $1.7 billion (the "Merger"), subject to satisfaction of certain conditions, including obtaining all requisite regulatory clearances.   On July 6, 2023, the European Commission announced that it had opened an investigation into whether the consummation of the Merger complied with European competition law.   On July 24, 2023, iRobot obtained the First Lien Term Loan Facility to refinance its existing funded debt and provide incremental liquidity to fund its operations during the extended regulatory review process of the Merger.   At the same time, Amazon reduced its offer price to $1.4 billion.   Following feedback received from U.S. and European antitrust regulators in early 2024, Amazon and iRobot determined that there was no viable path to obtaining the requisite regulatory clearances to consummate the Merger. Consequently, on January 28, 2024, Amazon and iRobot mutually agreed to terminate the Merger Agreement.

60.    Beginning in or around February 2025, the Company re-initiated a marketing process (the "Prepetition Marketing Process") to solicit interest from potential strategic acquirors and financial investors with respect to (a) the possible sale of the Company or all or some portion of its assets, business combination, licensing agreement, or other strategic action or (b) new financing.

---

[18]    More specifically, the Merger Agreement provided for Merger Sub and iRobot to merge, with iRobot surviving the merger as a wholly owned subsidiary of Amazon.

61.     As part of the Prepetition Marketing Process, the Company engaged investment bankers and undertook significant outreach.  As a result of those efforts, multiple third parties conducted extensive due diligence, and various go-forward structures and partnerships were considered and explored.  Discussions continued through the Spring and Summer of 2025, including with the Prior First Lien Secured Parties, who allowed the Debtors to access previously restricted cash on numerous occasions to provide the Company with necessary liquidity while it pursued any viable going-concern paths.  The Company ultimately entered into exclusive negotiations with a potential purchaser.  However, as noted above, in October 2025, the potential purchaser withdrew from the sale process.   The Company later disclosed that the per share offer price offered by the potential purchaser during such negotiations was significantly lower than the trading price of the Company's stock during the several months prior to the counterparty's withdrawal.

62.     Thereafter, while continuing to explore any further potential strategic alternatives, the Debtors also began contingency planning in parallel, including preparations for these Chapter 11 Cases.  At that time, the direction for these Chapter 11 Cases was uncertain, with a real possibility that the Company would have no choice but to implement an orderly, Court-supervised wind down of its U.S. and foreign operations.

### D.     Covenant Defaults, Waivers & the Assignment

63.     In the approximately ten months prior to the Petition Date, the Company faced several impending covenant defaults under its First Lien Credit Agreement.

64.     iRobot's audited financial statements for its fiscal year ended December 28, 2024 included an explanatory paragraph expressing substantial doubt about the Company's ability to continue as a going concern and, thus, iRobot was unable to comply with its covenant under the First Lien Credit Agreement to provide the Prior First Lien Lenders with its

audited annual financial statements without any exception regarding the Company's ability to continue as a going concern. The Company also anticipated that it would be unable to comply with certain financial covenants under the First Lien Credit Agreement. Accordingly, the First Lien Credit Agreement was amended on the following six dates: March 11, 2025, April 30, 2025, June 5, 2025, August 6, 2025, September 12, 2025, and October 22, 2025, respectively (collectively, the "Six Amendments"). Pursuant to the Six Amendments, the Prior First Lien Secured Parties agreed to waive certain covenant defaults for a specified time period and further extend such waiver period as the Company pursued the Prepetition Marking Process. As discussions among the Company, the Prior First Lien Lenders and Picea coalesced around the transactions contemplated by the Prepackaged Plan, on November 24, 2025, the Prior First Lien Lenders executed the Assignment, thereby irrevocably selling and assigning to Picea HK, among other things, all of the Prior First Lien Lenders' rights and obligations under the First Lien Credit Agreement, as well as all claims, suits, causes of action and any other rights of such Prior First Lien Lenders arising under or in connection with the First Lien Credit Agreement. In connection with the Assignment, the Company and certain non-debtor affiliates, on the one hand, and the Prior First Lien Secured Parties, on the other, executed a mutual release agreement on November 24, 2025. Also, in connection with the Assignment, the Company and the First Lien Secured Parties entered into a seventh amendment to the First Lien Credit Agreement on November 24, 2025, further extending the waiver period and deferring the payment of interest to January 15, 2026.

### E.    Contingency Planning

65.    While the Prepetition Market Process was unfolding in Spring 2025, the Company retained Paul, Weiss, as counsel, and A&M, as financial advisor, to begin chapter 11 contingency planning. Once it was determined that the Prepetition Marketing Process would not yield an actionable transaction, the Company resumed chapter 11 contingency planning with

Paul, Weiss and A&M and, in October 2025, engaged Young Conaway (collectively with Paul, Weiss and A&M, the "Restructuring Professionals") as co-counsel to assist with chapter 11 preparations. In the months preceding the Petition Date, the Company, with the assistance of the Restructuring Professionals, explored multiple different paths, with the goal of maximizing value for the benefit of all stakeholders.

66. With cash and optionality dwindling, the Debtors determined that it was in their best interests to stop making scheduled payments to Picea Robotics under the Picea Supply Agreement. In connection with discussions with Picea Robotics regarding the Company's failure to make such scheduled payments under the Picea Supply Agreement, Picea Robotics expressed interest in potentially acquiring the Company. Shortly thereafter, the Debtors, Picea, and the Prior First Lien Secured Parties began discussing the framework for a global resolution that was in the best interests of all stakeholders and would, importantly, maintain the Debtors' going-concern operations around the globe. Ultimately, the Company was able to facilitate a comprehensive resolution with the Prior First Lien Secured Parties and Picea that culminated in execution of the Assignment and, later, the RSA, support for the Prepackaged Plan, and the commencement of these Chapter 11 Cases to implement the Company's comprehensive restructuring.

### F.    Restructuring Support Agreement

67. After implementing the Assignment, the Debtors and Picea engaged in extensive good faith negotiations regarding the form and implementation process for the Company's restructuring, and eventually entered into the RSA on or about December 14, 2025, memorializing the terms of the restructuring transactions pursuant to the Prepackaged Plan attached as Exhibit A to the RSA and Picea HK's agreement to allow the Debtors to utilize cash collateral on agreed-upon terms during these Chapter 11 Cases. Pursuant to the RSA and subject

to the conditions specified therein, Picea agreed to, among other things, support the restructuring transactions, and Picea HK agreed to vote in favor of the Prepackaged Plan.

68.     Pursuant to the RSA, the Restructuring Transactions contemplated by the Prepackaged Plan shall be implemented in accordance with the following milestones:

- Petition Date shall take place on or before December 17, 2025;

- Prepackaged Plan, Disclosure Statement, Scheduling Motion and Cash Collateral Motion shall be filed on the Petition Date;

- Court shall enter the Scheduling Order and Interim Cash Collateral Order no later than five days after the Petition Date;

- Court shall enter the Final Cash Collateral Order no later than 30 days after the Petition Date;

- Court shall enter the Confirmation Order no later than 45 days after the Petition Date; and

- Plan Effective Date shall have occurred no later than 30 days after entry of the Confirmation Order, subject to certain designated causes for extension.

69.     The Debtors have agreed to the above milestones in the RSA to ensure an orderly and timely implementation of the restructuring transactions set forth in Prepackaged Plan. The milestones allow the Debtors to comply with the notice requirements for confirmation under the Bankruptcy Code, Bankruptcy Rules, and Local Rules, while at the same time proceeding swiftly to confirmation of the Plan and emergence from the Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Debtors' business, and limit professional fees and administrative costs.  As a result, I believe that the milestones in the RSA are fair and reasonable, and that expeditious confirmation of the Prepackaged Plan and consummation of the restructuring transactions is in the best interests of the Debtors, their estates, and their stakeholders.

70.     In connection with the RSA, the Company and Picea HK also reached an agreement allowing the Debtors to use cash collateral on a consensual basis during the pendency of these Chapter 11 Cases in accordance with the budget (the "Budget") filed with the cash collateral motion referenced below.  I believe that the Budget positions the Debtors to prosecute these Chapter 11 Cases, including with respect to the Prepackaged Plan, and demonstrates that the Debtors will have adequate liquidity to prosecute these Chapter 11 Cases in the manner contemplated.

71.     Given the substantial benefits of the restructuring transactions set forth in the Prepackaged Plan, I believe that the proposed Prepackaged Plan currently represents the best available path forward to maximize the value of the Debtors' estates for all stakeholders.  I further believe that reaching consensus on the Prepackaged Plan prior to commencing these Chapter 11 Cases was critical to ensuring a smooth landing in chapter 11.  Moreover, I understand that the Debtors' obligation under the RSA are subject to a fiduciary out, thus ensuring that the Debtors are able to continue considering all unsolicited offers during these Chapter 11 Cases.

**G.    Solicitation of the Prepackaged Plan and Commencement of these Chapter 11 Cases**

72.     On December 14, 2025, the Debtors began soliciting votes on the Prepackaged Plan by instructing their voting agent, Stretto, Inc. ("Stretto"), to distribute a solicitation package containing the Disclosure Statement, including the Prepackaged Plan and exhibits thereto, and two ballots to Picea HK, the lone holder of impaired claims that is entitled to vote – i.e. Class 3 First Lien Claims and Class 4 Picea HK Supply Agreement Claims – determined as of the voting record date of December 13, 2025.  As set forth in the *Declaration of Selwyn Perry of Stretto, Inc. Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates*, filed

contemporaneously herewith, following the occurrence of the voting deadline on December 14, 2025, Stretto informed the Debtors that Picea HK had timely submitted its ballots and that the two impaired classes had voted unanimously to accept the Prepackaged Plan:

| Voting Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|---|
| 3 | First Lien Claims | 1 100.00% | 0 0.00% | $180,000,000 | $0.00 | Accept |
| 4 | Picea HK Supply Agreement Claims | 1 100% | 0 0.00% | $74,000,000 | $0.00 | Accept |

73.     As further described below, the Debtors have filed a motion seeking entry of an order (a) scheduling a combined hearing for the Court to consider approval of the Disclosure Statement and the prepetition solicitation procedures, as well as confirmation of the Prepackaged Plan; and (b) establishing related objection and other deadlines, with the goal of emerging from these Chapter 11 Cases as soon as practicable within the milestones agreed to in the RSA.

**III.    The Prepackaged Plan**

74.     The RSA and Prepackaged Plan contemplate the following key terms:

   *a.  Restructuring of Current Debt, Cancellation of Existing Equity Interests*

       *i.* Picea HK, as the holder of 100% of the outstanding Allowed First Lien Claims, shall receive, in full and final satisfaction, release, discharge of, and in exchange for, such Allowed First Lien Claim, 95% of the New Common Equity.

       *ii.* Picea HK, as the holder of 100% of the outstanding Picea HK Supply Agreement Claims, will receive, in full and final satisfaction, release, discharge of, and in exchange for, a waiver of approximately $74,000,000 of the Picea Supply Agreement Claims, 5% of the New Common Equity.  The remaining outstanding amount of approximately $84 million due to Picea Robotics under the Picea Supply Agreement shall remain due and owing as of the Effective Date.

> > iii. On the Effective Date, each Holder of an Existing Equity Interest shall have its Existing Equity Interest cancelled, released, and extinguished without any distribution.
>
> b. *Treatment of Other Claims and Interests*
>
> > i. Allowed Administrative Claims will be paid in Cash on the latest of the Effective Date, the date on which such Administrative Claim becomes Allowed, or on the date on which an Allowed Administrative Claim becomes payable in the ordinary course of business, unless otherwise agreed to by the Holder of such Claim and the Debtors or the Reorganized Debtors, as applicable;
> >
> > ii. Other Priority Claims, Other Secured Claims, and General Unsecured Claims will be unimpaired;
> >
> > iii. Intercompany Claims shall be Reinstated or cancelled, released and extinguished without any distribution; and
> >
> > iv. Intercompany Interests shall be Reinstated or cancelled, released, and extinguished without any distribution.
>
> c. *Post-Effective Date Corporate Structure*
>
> > i. iRobot will become a private company owned by Picea HK and will be delisted from the NASDAQ with the same corporate ownership structure outlined herein.

75.    Through the restructuring, the Debtors will emerge from these Chapter 11 Cases with a more sustainable capital structure that is better aligned with the Debtors' present and future operating prospects.

## IV.    First Day Motions

76.    As a result of my first-hand knowledge, review of various materials, and information, and discussions with members of the Debtors' management and Restructuring Professionals, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders through the Prepackaged Plan, and (c) the immediate and irreparable harm to which the Debtors will be

exposed upon the commencement of these Chapter 11 Cases unless the limited relief requested in the First Day Motions is granted without delay.

77. Accordingly, it is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the following First Day Motions is not granted:

**A.    *Administrative Pleadings***

    **i.**    *Debtors' Motion for Entry of an Order, Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

    **ii.**    *Debtors' Application for Entry of an Order Authorizing the Debtors to Retain Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date;*

    **iii.**    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated (A) Creditor Matrix and (B) List of the 30 Largest Unsecured Creditors; (II) Authorizing Redaction of Certain Personal Identification Information; (III) Modifying the Requirement to File a List of Equity Security Holders of iRobot Corporation and Waiving the Requirement to Provide Direct Notice Thereto; and (IV) Granting Related Relief;*

    **iv.**    *Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code; (II) Approving Notice Related to Non-Debtor Affiliates; and (III) Granting Related Relief; and*

    **v.**    *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock of iRobot Corporation; and (II) Granting Related Relief.*

**B.    *Operational and Scheduling Pleadings***

    **i.**    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief;*

    **ii.**    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Honoring Certain Prepetition Obligations, and (D) Performance of Intercompany Transactions; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; (III) Suspending the Time to Comply with 11 U.S.C.*

*§ 345(b) and Waiving Certain Operating Guidelines, as Applicable; and (IV) Granting Related Relief;*

iii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue and Pay All Prepetition Obligations Relating to Their (A) Prepetition Insurance Policies, Including the Premium Finance Agreement and (B) Surety Bond Program, Including the Letter of Credit; and (II) Granting Related Relief;*

iv. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto; (II) Authorizing the Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* (the "Customer Programs Motion");

v. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service; (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment; (III) Establishing Procedures for Resolving Requests for Additional Assurance; and (IV) Granting Related Relief;*

vi. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief;*

vii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business and (II) Granting Related Relief;*

viii. *Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* (the "Scheduling Motion"); and

ix. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Cash Collateral Motion").

78.     With respect to the Cash Collateral Motion, the Debtors require cash to fund their business operations throughout these Chapter 11 Cases and to consummate the restructuring transactions contemplated by the Prepackaged Plan.  The Debtors have determined that access to Cash Collateral (as defined in the Cash Collateral Motion) will be sufficient to continue operating their business during these Chapter 11 Cases while pursuing confirmation of the Prepackaged Plan. Without prompt access to Cash Collateral, on the terms set forth in the Budget, the Debtors would be unable to, among other things, (a) pay employee wages, insurance and other critical obligations; (b) fund the administration of these Chapter 11 Cases; and (c) make prompt payment to trade vendors and other service partners, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

79.     At this time, the Debtors seek authority to use Cash Collateral on an interim basis pending entry of the Final Order (such interim period, the "Interim Period").  Following extensive arm's length and good faith negotiations between the Debtors and Picea HK, Picea HK has consented to the Debtors' use of Cash Collateral to fund operations and the costs of administering their estates during the Interim Period in accordance with the Budget, subject to the Permitted Variances (as defined in the Cash Collateral Motion), on the terms set forth in the Proposed Orders.  By the Cash Collateral Motion, the Debtors also seek authority to continue the consensual use of Cash Collateral on a final basis.

80.     The Debtors, in consultation with A&M, prepared the thirteen-week Budget, as may be updated from time to time in accordance with the terms of the Interim Order, reflecting anticipated cash receipts, operating disbursements, and non-operating expenditures, among other things.  The Debtors believe that the Budget establishes that the Debtors should have adequate liquidity to prosecute these Chapter 11 Cases in the manner contemplated.  The Budget

contains line items for cash flows anticipated to be received and disbursed during the time-period for which the Approved Budget has been prepared. The Debtors believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in the first thirteen weeks of these Chapter 11 Cases.

81. The Debtors have an immediate postpetition need to use Cash Collateral. The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases or prosecute the Prepackaged Plan without access to Cash Collateral. The Debtors believe that substantially all of their available cash constitutes Picea HK's Cash Collateral. The Debtors will, therefore, be unable to consummate the Prepackaged Plan or otherwise fund these Chapter 11 Cases without immediate access to Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest in the event that the relief requested in the Cash Collateral Motion is not granted. Accordingly, for the reasons set forth herein and in the Cash Collateral Motion, the Debtors respectfully request that the Cash Collateral Motion be approved.

82. With respect to the balance of the First Day Motions, as noted above, the relief sought in the various First Day Motions will allow the Debtors to, among other things, (i) establish certain administrative procedures to promote a seamless transition into and through chapter 11, (ii) ensure the continuation of their business operations and cash management system without interruption, (iii) obtain authority to use cash collateral in the operation of the Debtors' businesses during the Debtors' brief time in chapter 11, (iv) preserve valuable relationships with trade vendors, manufacturing partners and other creditors whose claims are not expected to be impaired under the Prepackaged Plan, and (v) schedule a combined hearing for the Court to

consider the adequacy of the Disclosure Statement, approval of the Debtors' prepetition solicitation procedures, and confirmation of the Prepackaged Plan.

83.     I am familiar with the content and substance of the First Day Motions and the facts referenced therein are incorporated herein by reference.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.  If asked to testify as to the facts supporting each First Day Motion, I would testify as to such facts.

84.     It is my belief that the relief sought in the First Day Motions is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates through the restructuring process described herein.

85.     Several First Day Motions request authority to pay certain prepetition claims.  I am advised by the Debtors' proposed counsel that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  Given this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

86.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 14, 2025

/s/ *Karian Wong*

Karian Wong
Chief Financial Officer

**<u>Exhibit A</u>**

**Organizational Chart**

