**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| iROBOT CORPORATION, *et al.*,[1] | ) |
|  | ) Case No. 25-12197 (BLS) |
| Debtors. | ) |
|  | ) (Jointly Administered) |
|  | ) |
|  | ) **Ref. Docket Nos. 16, 17, 61, 110, & 115** |

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF (A) APPROVAL OF THE DEBTORS'
DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE DEBTORS' PLAN**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: iRobot Corporation (9335); iRobot US Holdings, LLC (5237); and iRobot Holdings LLC (5307). For purposes of these chapter 11 cases, the Debtors' service address is 8 Crosby Drive, Bedford, MA 01730.

**TABLE OF CONTENTS**

**Page(s)**

Table of Authorities ..................................................................................................... iii

Preliminary Statement.................................................................................................. 2

Background ................................................................................................................... 3

I.        The Restructuring Support Agreement ............................................................ 3

II.       Solicitation and Filing of Plan Documents ..................................................... 4

          A.        Voting Results............................................................................... 8

          B.        Informal Comments ..................................................................... 10

Argument ..................................................................................................................... 11

I.        The Disclosure Statement Contains "Adequate Information" as Required by
          Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable
          Notice Requirements............................................................................................ 11

          A.        The Debtors Provided Sufficient Notice of the Hearing and Objection
                    Deadline for Approval of the Disclosure Statement ............................. 11

          B.        The Disclosure Statement Satisfies the Requirements of the Bankruptcy
                    Code and Should Be Approved............................................................. 12

                    1.        The Disclosure Statement Contains Adequate Information...................... 12

                    2.        The Disclosure Statement Demonstrates that the Debtors Complied
                              with Applicable Nonbankruptcy Law ........................................ 15

          C.        The Solicitation Procedures Complied with the Bankruptcy Code and the
                    Bankruptcy Rules............................................................................... 18

                    1.        The Ballots Used to Solicit the Holders of Claims Entitled to Vote on
                              the Plan Complied with the Bankruptcy Rules ......................................... 19

                    2.        The Voting Record Date Complied with Bankruptcy Rules and
                              the Scheduling Order ........................................................... 19

                    3.        The Debtors' Solicitation Period Complied with
                              Bankruptcy Rule 3018 and the Scheduling Order ................................. 20

                    4.        The Debtors' Vote Tabulation Was Appropriate and Complied with
                              the Scheduling Order ......................................................................... 20

                    5.        Waiver of Certain Solicitation Package Mailings Is Reasonable and
                              Appropriate and Complied with the Scheduling Order .......................... 21

                    6.        Solicitation of the Plan Complied with the Bankruptcy Code and Was
                              in Good Faith ....................................................................................... 22

II.      The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should Be Confirmed ........................................................... 23

         A.      Section 1129(a): The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code ........................... 23

                 1.       Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code ........................................................ 23

                 2.       Section 1129(a)(2): The Debtors Have Complied with the Bankruptcy Code ...................................................................................... 43

                 3.       Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Is Not by Any Means Forbidden by Law .................................................. 45

                 4.       Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval ................................................ 45

                 5.       Section 1129(a)(5): The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ........................ 46

                 6.       Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes ...... 47

                 7.       Section 1129(a)(7): The Plan Satisfies the "Best Interests" Test ........... 47

                 8.       Section 1129(a)(8): The Plan Has Been Accepted by Each Impaired Voting Class ....................................................................................... 49

                 9.       Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims ........................................................................ 50

                 10.      Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan ................................................................................. 50

                 11.      Section 1129(a)(11): The Plan Is Feasible ............................................. 51

                 12.      Section 1129(a)(12): All Statutory Fees Have or Will Be Paid Under the Plan .................................................................................................. 53

                 13.      Section 1129(a)(13): The Plan Does Not Modify Retiree Benefits ......... 54

         B.      Section 1129(b): The Plan Satisfies the "Cram-Down" Requirements .............. 54

                 1.       The Plan Does Not Discriminate Unfairly .............................................. 55

                 2.       The Plan Is Fair and Equitable ............................................................... 56

         C.      Section 1129(c): The Plan Is the Only Plan Currently on File ........................... 58

         D.      Section 1129(d): The Purpose of the Plan Is Not Tax or Securities Law Avoidance ...................................................................................................... 58

         E.      Section 1129(e): Does Not Apply to the Plan .................................................... 58

III.     Good Cause Exists to Waive the Stay of the Confirmation Order .................................. 59

Conclusion ................................................................................................................................... 60

**Table of Authorities**

**Page(s)**

**CASES**

*In re 203 N. LaSalle St. Ltd. P'ship.*,
190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds, Bank of Am.*,
526 U.S. 434 (1999)..................................................................................................54

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007)......................................................................47

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...............54

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)....................................................................................23

*Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...........................................................................................46, 56

*In re Basic Fun, Inc.*,
Case No. 24-11432 (CTG), Docket No. 261 (Bankr. D. Del. Oct. 21, 2024)..........37

*In re BAWT Enterprises LLC*,
Case No. 24-12215 (MFW), Docket No. 68 (Bankr. D. Del. Oct. 28, 2024) .........37

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985).........................................................................55

*Century Glove, Inc.* v. *First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988).......................................................................................13

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...................................................................31, 35

*Cosoff* v. *Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983)......................................................................................31

*In re Cypresswood Land Partners*,
*I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) .........................................................43

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992).......................................................................44

*In re Eddington Thread Mfg. Co.*,
181 B.R. 826 (Bankr. E.D. Pa. 1995) ......................................................................51

*In re Exaeris, Inc.*,
    380 B.R. 741 (Bankr. D. Del. 2008) ................................................................31

*In re Exactech, Inc.*,
    No. 24-12441 (LSS), Docket No. 1647 (Bankr. D. Del. Sept. 17, 2025) ...............37

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ................................................................32

*In re Franchise Group, Inc.*,
    Case No. 24-12480 (LSS), Docket No. 1596 (Bankr. D. Del. June 2, 2025) .........37

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ........................................................55

*In re Glob. Ocean Carriers Ltd.*,
    251 B.R. 31 (Bankr. D. Del. 2000) ................................................................58

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...........................................................57

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...........................................................24, 55

*Harrington* v. *Purdue Pharma L.P.*,
    603 U.S. 204, 225–227 (2024).......................................................................37

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ....................................................... *passim*

*ION Media Networks, Inc.* v. *Cyrus Select Opportunities Master Fund Ltd. (In re ION Media Networks, Inc.)*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ............................................................58

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).....................................................................24, 54

*John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)..........................................................................24

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane* v. *Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ........55

*Kane* v. *Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988)......................................................................51, 54

*Kirk* v. *Texaco, Inc.*,
 82 B.R. 678 (S.D.N.Y. 1988) ........................................................................................13

*Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*,
 337 F.3d 314 (3d Cir. 2003) ........................................................................................12

*In re Lisanti Foods, Inc.*,
 329 B.R. 491 (D.N.J. 2005)
 *aff'd sub nom. In re Lisanti Foods Inc.*, 241 F. App'x 1 (3d Cir. 2007) ...........................13, 46

*In re Maremont Corp.*, 601 B.R. 1 (Bankr. D. Del. 2019) ............................................................59

*In re Mariner Post-Acute Net., Inc.*,
 303 B.R. 42 (Bankr. D. Del. 2003) ..............................................................................11

*Mercury Cap. Corp.* v. *Milford Conn. Assocs., L.P.*,
 354 B.R. 1 (D. Conn. 2006) .........................................................................................51

*In re Metrocraft Pub. Servs.*, Inc.,
 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) ...................................................................14

*In re Nickels Midway Pier, LLC*,
 No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ...........................24

*In re Nutritional Sourcing Corp.*,
 398 B.R. 816 (Bankr. D. Del. 2008) ............................................................................23

*Oneida Motor Freight, Inc.* v. *United Jersey Bank*,
 848 F.2d 414 (3d Cir. 1988) ........................................................................................13

*In re Phoenix Petroleum Co.*,
 278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................................13, 14

*Pizza of Haw., Inc.* v. *Shakey's, Inc.* (*In re Pizza of Haw., Inc.*),
 761 F.2d 1374 (9th Cir. 1985) .....................................................................................51

*In re Premier Int'l Holdings, Inc.*,
 No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ...........................40

*In re Prudential Energy Co.*,
 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ...........................................................................52

*In re Prussia Assocs.*,
 322 B.R. 572 (Bankr. E.D. Pa. 2005) ..........................................................................51

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000) ........................................................................................40

*In re River Village Assoc.*,
    181 B.R. 795 (E.D. Pa. 1995) ...................................................................................13

*In re Rochem, Ltd.*,
    58 B.R. 641 (Bankr. D.N.J. 1985) .............................................................................24

*In re S B Bldg. Assocs.*,
    621 B.R. 330 (Bankr. D.N.J. 2020) ...........................................................................55

*In re Seaplane Debtor 1, Inc.*,
    Case No. 24-10703(CTG), Docket No. 680 (Bankr. D. Del. Dec. 11, 2024) ...........37

*In re Smallhold, Inc.*,
    Case No. 24-10267 (CTG), Docket No. 288 (Bankr. D. Del. Sept. 25, 2024) ..........37

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ..........................................................................23

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988)........................................................................14

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ..........................................................................31

*In re Spansion Inc.*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ...............40

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................................................55

*In re Texas Extrusion Corp.*,
    844 F.2d 1142, 1159 n.23 (5th Cir. 1988) .................................................................46

*In re Trump Taj Mahal Assocs.*,
    156 B.R. 928 (Bankr. D.N.J. 1993) ...........................................................................11

*In re U.S. Brass Corp.*,
    194 B.R. 410, 424–25 (Bankr. E.D. Tex. 1996) ........................................................14

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...............................................................31, 32, 40

*In re WW Int'l, Inc.*,
    Case No. 25-10829 (CTG), Docket No. 177 (Bankr. D. Del. June 17, 2025) ..........37

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ..........................................................................31

*In re WorldCom, Inc.,*
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........................52

*In re W.R. Grace & Co.,*
    475 B.R. 34, 115 (D. Del. 2012) ...........................................................................................51

*In re Zenith Elecs. Corp.,*
    241 B.R. 92 (Bankr. D. Del. 1999) .......................................................................................31

**STATUTES**

11 U.S.C. § 101(31) ...........................................................................................................................32

11 U.S.C. § 105 ..................................................................................................................................41

11 U.S.C. § 365 .........................................................................................................................29, 42, 59

11 U.S.C. § 1107(a) ...........................................................................................................................5

11 U.S.C. § 1108 ................................................................................................................................5

11 U.S.C. § 1114 ................................................................................................................................54

11 U.S.C. § 1122 ......................................................................................................................... *passim*

11 U.S.C. §§ 1123(a)(1)-(7) ......................................................................................................... *passim*

11 U.S.C. § 1123(b) ..................................................................................................................... *passim*

11 U.S.C. § 1123(d) ...........................................................................................................................42

11 U.S.C. §§ 1125(a), (b), (e), (g) ............................................................................................... *passim*

11 U.S.C. §§ 1126(a)-(g) ............................................................................................................. *passim*

11 U.S.C. §§ 1129(a)(1)-(16) ....................................................................................................... *passim*

11 U.S.C. §§ 1129(b)-(e) ............................................................................................................. *passim*

11 U.S.C. § 1145 ...........................................................................................................................17, 27

11 U.S.C. § 1146 ................................................................................................................................27

28 U.S.C. §§ 157(b)(2)(L) ................................................................................................................40

28 U.S.C. § 1930 ................................................................................................................................53

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 1015(b) ..................................................................................................6

Fed. R. Bankr. P. 2002(b) ......................................................................................8, 11, 12

Fed. R. Bankr. P. 3017(a), (d), (e) ........................................................................... *passim*

Fed. R. Bankr. P. 3018(a)-(c) .................................................................................. *passim*

H.R. Rep. No. 95-595 (1977).........................................................................13, 23, 43

Local Rule 3017-1(a) ...................................................................................................8, 11

S. Rep. No. 95-989 (1978) ...........................................................................................13, 23

Securities Act, Regulation D.....................................................................................16, 17, 18

Securities Act, Regulation S ......................................................................................16, 17

Securities Act, Rule 144A...........................................................................................16, 18

Securities Act, Rule 501(a) .........................................................................................17, 18

Securities Act, Rule 902 ..............................................................................................17, 18

Securities Act, Section 4(a)(2) ....................................................................................16, 17

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law in support of the proposed order (i) approving the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates* [Docket No. 17] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), and (ii) confirming the *Modified Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates* filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan").[2]

In further support of Confirmation of the Plan and final approval of the Disclosure Statement, prior to, or substantially contemporaneously with the filing of this brief (this "Confirmation Brief"), the Debtors also filed the following documents:

(a)    *Declaration of Karian Wong in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 19] (the "First Day Declaration");

(b)    *Affidavit of Service* [Docket No. 25] (the "Solicitation Affidavit");

(c)    *Affidavit of Service* [Docket Nos. 70, 75, 111, and 114] (the "Non-Voting Status Affidavits");

(d)    *Certificate of Publication* [Docket No. 73] (the "Publication Affidavit");

(e)    *Declaration of Selwyn Perry of Stretto, Inc. Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates* [Docket No. 18] (the "Voting Report");

(f)    *Notice of Parties Opting Into Third-Party Releases Set Forth in Article VIII.D of the Debtors' Modified Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "Release Opt-In Notice");

(g)    *Declaration of Karian Wong, Chief Financial Officer, in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot*

---

[2]    The Plan filed contemporaneously herewith modifies the *Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates* [Docket No. 16] filed on the Petition Date to address and resolve comments received from various interested parties.

*Corporation and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "Wong Declaration");

(h)     *Declaration of George Varughese in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "Varughese Declaration"); and

(i)     *Declaration of Andrew Khoo in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of iRobot Corporation and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "Khoo Declaration" and, collectively with the Voting Report, the Release Opt-In Notice, the Wong Declaration, and the Varughese Declaration, the "Supporting Declarations").

## Preliminary Statement[3]

1.     The Debtors seek approval of the Disclosure Statement and confirmation of the Plan to implement a comprehensive going concern restructuring premised on eliminating all of the Debtors' funded debt obligations, obtaining favorable go-forward supplier agreements, and enabling the Debtors to execute on their go-forward business plan to succeed in a competitive industry.  As set forth in the Voting Report, prior to the Petition Date, the Holders of 100% in principal amount of the First Lien Claims and 100% of the Picea HK Supply Agreement Claims—the only parties entitled to vote on the Plan—voted to accept the Plan.

2.     As set forth below and in the Supporting Declarations, the proposed comprehensive restructuring set forth in the Plan contemplates a $257 million deleveraging of the Debtors' balance sheet, maximizes stakeholder recoveries, and protects the Debtors' employees' jobs, while leaving General Unsecured Claims Unimpaired.

3.     Importantly, the Debtors are pursuing confirmation of the Plan and approval of the Disclosure Statement with broad stakeholder support on an uncontested basis.  No party in interest

---

[3]     Capitalized terms used in the Preliminary Statement have the meanings ascribed to them in the remainder of this Confirmation Brief, the Plan, or the Disclosure Statement, as applicable.  All references to an Article refer to the applicable article of the Plan unless otherwise specified herein.

has raised any formal objection to confirmation of the Plan or approval of the Disclosure Statement, and the Debtors have worked with various parties in interest, including the U.S. Trustee, to resolve informal comments by modifying certain provisions of the Plan and including clarifying provisions in Confirmation Order.

4.      For the reasons set forth herein and based upon the evidence to be adduced at the Combined Hearing, the Debtors submit that the Court should approve the Disclosure Statement, confirm the Plan, and permit the Debtors to emerge from these Chapter 11 Cases on an expedited basis for the benefit of all stakeholders.

**Background**

### I.      The Restructuring Support Agreement

5.       Prior to commencing these Chapter 11 Cases, on December 14, 2025, the Debtors and Picea entered into the Restructuring Support Agreement after extensive arm's-length negotiations.

6.      The Restructuring Support Agreement contemplates, and the Plan implements, among other things:

(a)      the equitization of all Allowed First Lien Claims and all Allowed Picea HK Supply Agreement Claims;

(b)      the Debtors' entry into the New Picea Supply Agreement;

(c)      the Assumption of all Executory Contracts and Unexpired Leases;

(d)      Allowed General Unsecured Claims will be Unimpaired under the Plan and treated in the ordinary course;

(e)      the creation of a wholly owned subsidiary organized under the laws of the State of Delaware ("iRobot Safe Corporation") for the purpose of, among other things, ensuring that appropriate safeguards are in place for personal data and appointing a Data Security Officer of iRobot Safe Corporation to ensure continued protection of personal and sensitive information; and

(f)      the cancellation of all Existing Equity Interests on the Effective Date.

3

7.      In order to administer these Chapter 11 Cases, pursuant to the Restructuring Support Agreement, Picea agreed to the Debtors' consensual use of Cash Collateral, the terms of which are set forth in the Final Cash Collateral Order.

8.      The Debtors' obligations under the Restructuring Support Agreement are subject to a fiduciary-out provision, thus ensuring that the Debtors have been and remain able to consider unsolicited alternative proposals during these Chapter 11 Cases.  As of the date hereof, the Debtors have not received any alternative proposal—viable or otherwise—that would provide greater value for all stakeholders in these Chapter 11 Cases.[4]

## II.      Solicitation and Filing of Plan Documents

9.      On December 14, 2025, prior to commencing these Chapter 11 Cases, but after the execution of the Restructuring Support Agreement, the Debtors launched solicitation of votes on the Plan by causing their solicitation and voting agent, Stretto, Inc. (the "Solicitation and Voting Agent") to transmit, via electronic mail, copies of the solicitation package containing the Disclosure Statement, including the solicitation version of the Plan and other exhibits thereto, and the Ballots, as applicable (the "Solicitation Package"), to the Holders of (a) First Lien Claims in Class 3 and (b) Picea HK Supply Agreement Claims in Class 4 (together, the "Voting Classes").[5] The Debtors were not required to solicit votes from Holders of Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Existing Equity Interests) (collectively, the "Non-Voting Classes") because the Holders in the Non-Voting Classes are either Unimpaired under the Plan and conclusively presumed to accept the Plan or are deemed to reject

---

[4]     Wong Decl. ¶ 6.

[5]     Voting Report ¶¶ 6, 7.

the Plan.  Instead, in accordance with the Scheduling Order (as defined below), the Debtors caused the Solicitation and Voting Agent to distribute a notice of non-voting status (the "Notice of Non-Voting Status") to the Holders of Claims and Interests in the Non-Voting Classes, other than Holders in Classes 6 and 7, on December 17, 2025.[6]  The Notice of Non-Voting Status, which was received by Holders of Existing Equity Interests, among others, also included a release opt in form (the "Release Opt-In Form") which provided certain Holders in the Non-Voting Classes the opportunity to opt into the Third-Party Release, notice of the Objection Deadline consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Scheduling Order, and instructions for where Holders can obtain copies of the Plan, Disclosure Statement, and related exhibits.

10.    Further, the Disclosure Statement contained the Debtors' (a) valuation analysis prepared by Alvarez & Marsal Securities, LLC ("A&M"), the Debtors' financial advisor and investment banker, attached to the Disclosure Statement as Exhibit D  (the "Valuation Analysis"); (b) the liquidation analysis prepared by A&M, attached to the Disclosure Statement as Exhibit E (the "Liquidation Analysis");  and  (c) financial projections (together with certain related assumptions) prepared by the Debtors' management and A&M, attached to the Disclosure Statement as Exhibit F (the "Financial Projections").

11.    Following the launch of solicitation, on December 14, 2025 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases.  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    These Chapter 11 Cases  are  being  jointly administered  pursuant  to

---

[6]    *See* Non-Voting Status Affidavits.  The Debtors were granted a waiver of the requirement to send the Notice of Non-Voting Status to Holders of Intercompany Claims and Intercompany Interests in Classes 6 and 7. *See* Scheduling Order ¶ 11.

Bankruptcy Rule 1015(b).[7]  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

12.    On the Petition Date, the Debtors filed the solicitation version of the Plan and the Disclosure Statement, as well as several other motions requesting relief to continue the Debtors' operations in the ordinary course during the pendency of these Chapter 11 Cases, including authority for the consensual use of cash collateral in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 15].

13.    On December 16, 2025, after notice and a hearing, the Court entered that certain *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* [Docket No. 54] (the "Scheduling Order").

14.    The Scheduling Order:  (a) conditionally approved the solicitation and voting procedures with respect to the Plan (the "Solicitation Procedures") and the Solicitation Package related thereto; (b) approved the Notice of Non-Voting Status (including the Release Opt-In Form)

---

[7]    *See Order, Pursuant to Bankruptcy Rule 1015(B) and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 42].

and the Combined Notice (as defined below); (c) established notice and objection procedures with respect to Confirmation of the Plan and approval of the Disclosure Statement; (d) established December 13, 2025, as the voting record date; (e) established December 14, 2025, at 11:59 p.m. (Prevailing Eastern Time) as the deadline for Holders of Claims entitled to vote on the Plan to submit their votes (the "Voting Deadline"); (f) established January 15, 2026, at 4:00 p.m. (Prevailing Eastern Time) as the date by which to file objections to the Plan and/or approval of the Disclosure Statement (the "Objection Deadline"); and (g) scheduled the commencement of the hearing to consider confirmation of the Plan and approval of the Disclosure Statement (the "Combined Hearing") for January 22, 2026, at 10:00 a.m. (Prevailing Eastern Time).

15.     The materials in the Solicitation Package also established and communicated how the Solicitation and Voting Agent would tabulate the votes and elections contained in the Ballots. Those Solicitation Procedures provided that, among other things:  (a) a timely, properly completed Ballot submitted by a Holder of Claims in a Voting Class would supersede and revoke any prior Ballot(s) submitted by that Holder; (b) Ballots that attempt to partially accept and partially reject the Plan would not be counted; (c) illegible Ballots would not be counted; (d) Ballots containing insufficient information to identify the Holder would not be counted; (e) any form of ballot other than the official form of Ballot sent by the Solicitation and Voting Agent would not be counted; and (f) Ballots received after the Voting Deadline (provided that such Voting Deadline has not been extended) would not be counted.

16.     In addition, the Debtors also caused the Solicitation and Voting Agent to serve a notice of the Combined Hearing and the Objection Deadline (the "Combined Notice") to all Holders of Claims and Interests in the Non-Voting Classes and all other parties in interest on

December 17 and 18, 2025.[8]   Accordingly, the Combined Notice was distributed at least 28 calendar days before the Objection Deadline, as required by Bankruptcy Rule 2002(b) and Local Rule 3017-1(a).  As further authorized by the Scheduling Order, the Debtors caused the Solicitation and Voting Agent to publish a substantially similar Combined Notice in the national edition of the *New York Times* on December 20, 2025, 33 days prior to the Combined Hearing.[9]

17.     On December 19, 2025, the Debtors filed the *Notice of Filing of Plan Supplement*, which included an initial draft of the Restructuring Transactions Memorandum (as modified, amended, or supplemented from time to time, the "Initial Plan Supplement").

18.     On January 8, 2026, the Debtors filed the *Notice of Filing of First Supplement to Plan Supplement* [Docket No. 110], which included the following exhibits (including drafts or forms of such documents, as applicable):  (a) the Restructuring Transactions Memorandum; (b) the New Organizational Documents; (c) the Identity of Members of the New Board; and (d) the Schedule of Retained Causes of Action (as modified, amended, or supplemented from time to time, the "First Supplement to the Plan Supplement" and together with the Initial Plan Supplement, the "Plan  Supplement").

### A.     Voting Results

19.     In accordance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the Plan. Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired by the Plan or (b) Impaired by the Plan such that they will receive no distribution of property under the

---

[8]     *See* Non-Voting Status Affidavits.

[9]     *See* Publication Affidavit.

Plan. As a result, the Non-Voting Classes were not entitled to vote on the Plan, and the Debtors did not solicit votes from the Holders of Claims and Interests in the Non-Voting Classes.

20. On the Petition Date, the Solicitation and Voting Agent filed the Voting Report. As set forth in the Voting Report, the Solicitation and Voting Agent tabulated the Ballots received by the Voting Deadline from the Holders of Claims in the Voting Classes.[10] All validly executed Ballots cast by the Holders of Claims entitled to vote in the Voting Classes received by the Solicitation and Voting Agent on or before the Voting Deadline were tabulated in accordance with the Solicitation Procedures.

21. The voting results, as reflected in the Voting Report, are summarized as follows:

| Class 3 Ballots – First Lien Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | | Dollars | % |
| Accept: | 1 | 100% | | $184,102,977.30 | 100% |
| Reject: | 0 | 0% | | $0.00 | 0% |
| Opt-In Release Election: | 1 | | | | |
| Tabulated Ballot Totals: | 1 | | | $184,102,977.30 | |
| Not Tabulated: | 0 | | | | |

| Class 4 Ballots – Picea HK Supply Agreement Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | | Dollars | % |
| Accept: | 1 | 100% | | $73,199,172.65 | 100% |
| Reject: | 0 | 0% | | $0.00 | 0% |
| Opt-In Release Election: | 1 | | | | |
| Tabulated Ballot Totals: | 1 | | | $73,199,172.65 | |
| Not Tabulated: | 0 | | | | |

---

[10]  *See* Voting Report ¶ 10.

9

22.     Based on the Voting Report, the voting results indicate that both Voting Classes (Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims)) voted to accept the Plan.

23.     The Solicitation and Voting Agent was also designated to tabulate which Holders of Claims elected to grant the Third-Party Release, either (a) in the case of Holders in the Non-Voting Classes, by submitting the Release Opt-In Form, or (b) in the case of the Holders in the Voting Classes, checking the appropriate opt-in box on its Ballots.  The Voting Report and Release Opt-In Notice set forth the Holders of Claims that submitted Ballots or the Release Opt-In Forms validly electing to opt into the Third-Party Release.[11]

24.     The Debtors refer the Court to the Plan, the Disclosure Statement, the Scheduling Order, the Plan Supplement, the Supporting Declarations, and the record of these Chapter 11 Cases for an overview of the Debtors' business and any other relevant facts that may bear on Confirmation of the Plan.  The Supporting Declarations and any testimony and other declarations that may be proffered or submitted in connection with the Combined Hearing are fully incorporated herein.

### B.     Informal Comments

25.     In advance of Confirmation, the Debtors received informal comments from various parties with respect to the Plan.  The informal comments, resolutions and the Debtors' responses are summarized in the chart attached hereto as Exhibit A (the "Response Chart").  As set forth in the Response Chart, the Debtors have resolved these informal comments and reflected such resolutions in the proposed Confirmation Order and/or the Plan, each filed contemporaneously herewith, as applicable.

---

[11]     *See id.*, Ex. A.; Notice of Non-Voting Status and Release Opt-In Notice, Ex. A.

**Argument**

26. This Confirmation Brief is divided into three parts. First, the Debtors request approval of the Disclosure Statement. Second, the Debtors address and demonstrate that the Plan satisfies the confirmation requirements set forth in section 1129 of the Bankruptcy Code. Third, and finally, the Debtors request a waiver of the stay of the Confirmation Order.

**I.    The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements**

**A.    The Debtors Provided Sufficient Notice of the Hearing and Objection Deadline for Approval of the Disclosure Statement**

27. Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure statement generally requires 28 days' notice. Similarly, Bankruptcy Rule 2002(b) and Local Rule 3017-1(a) provide that parties in interest should receive 28 days' notice of the objection deadline and the hearing to consider approval of the disclosure statement.

28. Consistent with longstanding Supreme Court precedent, the Third Circuit has found that "due process requires notice [be] reasonably calculated, under all the circumstances, to inform interested parties of the pendency" of a proceeding.[12] Whether a particular method of notice is reasonably calculated to inform interested parties is fact specific.[13]

29. As noted above, the Court entered the Scheduling Order on December 16, 2025, which among other things, scheduled the Combined Hearing, approved certain related objection and reply deadlines, and approved the form of Combined Notice and manner of service thereof. The Combined Notice informed all Holders of Claims and Interests of, among other things: (a) the

---

[12]    *In re Mariner Post-Acute Net., Inc.*, 303 B.R. 42, 46 (Bankr. D. Del. 2003) (citing *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)).

[13]    *See In re Trump Taj Mahal Assocs.*, 156 B.R. 928, 940 (Bankr. D.N.J. 1993).

11

commencement of these Chapter 11 Cases, (b) the date, time, and place of the Combined Hearing, (c) instructions for obtaining copies of the Disclosure Statement and Plan, (d) the Objection Deadline and the procedures for filing objections to the Disclosure Statement and confirmation of the Plan, and (e) procedures in respect of assumption of Executory Contracts and Unexpired Leases, and was served by the Solicitation and Voting Agent on December 17 and 18, 2025.[14] Accordingly, the Debtors submit that all parties in interest had at least 35 days' notice prior to the Combined Hearing and 28 days' notice prior to the Objection Deadline, in compliance with Bankruptcy Rules 3017(a) and 2002(b).

30.     Further, in accordance with the Scheduling Order, the Debtors caused the Publication Notice to be published in the national edition of the *New York Times* on December 20, 2025, which, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[15]   Both the Combined Notice and the Publication Notice included instructions regarding how to obtain the Plan and the Disclosure Statement free of charge through the Solicitation and Voting Agent's website.   Accordingly, the Debtors have satisfied Bankruptcy Rules 2002(b) and 3017(a).

**B.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved**

**1.      The Disclosure Statement Contains Adequate Information**

31.     The primary purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[16]  "Adequate information" is a flexible standard, based on the

---

[14]     *See* Non-Voting Status Affidavits.

[15]     *See* Publication Affidavit.

[16]     S*ee, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003)

facts and circumstances of each case.[17]    Courts within the Third Circuit and elsewhere acknowledge that bankruptcy courts have broad discretion in determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code.[18]

32.    Courts generally look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

- the events that led to the filing of a bankruptcy petition;

- the relationship of the debtors with their affiliates;

- a description of the debtors' available assets and their value;

- the anticipated future of the companies;

- the source of information stated in the disclosure statement;

- the present condition of the debtors while in chapter 11;

- claims asserted against the debtors;

- the estimated return to creditors under a chapter 7 liquidation;

---

(providing that a disclosure statement must contain "adequate information [to] enable a creditor to make an informed judgment about the Plan" (internal quotations omitted)); *Century Glove, Inc.* v. *First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[17]    11 U.S.C. § 1125(a)(1) ("'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *see also Oneida Motor Freight, Inc.* v. *United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("the information required will necessarily be governed by the circumstances of the case").

[18]    *See, e.g.*, *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case."), *aff'd sub nom. In re Lisanti Foods Inc.,* 241 F. App'x 1 (3d Cir. 2007); *Kirk* v. *Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a): 'Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case.'" (quoting H.R. Rep. No. 595, at 408–09 (1977))); *see also In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.").

- the chapter 11 plan or a summary thereof;

- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;

- information relevant to risks posed to creditors under the plan;

- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

- litigation likely to arise in a nonbankruptcy context; and

- tax attributes of the debtors.[19]

33.    The Disclosure Statement contains adequate information.    The Disclosure Statement contains descriptions and summaries of, among other things, (a) the Plan, (b) the Debtors' business operations, (c) key events leading to the commencement of these Chapter 11 Cases, (d) the Debtors' prepetition indebtedness, (e) the proposed capital structure of the Reorganized Debtors, (f) the Financial Projections demonstrating the Debtors' ability to meet their obligations under the Plan, (g) the Valuation Analysis setting forth the Debtors' estimated implied going-concern equity value upon emergence from chapter 11, (h) the Liquidation Analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, (i) securities disclosures with respect to the Plan, (j) risk factors associated with the Plan, and (k) federal tax law consequences of the Plan.    Furthermore, advisors to the Debtors' key stakeholder and sole voting creditor, Picea, had an opportunity to review and

---

[19]    *See In re U.S. Brass Corp.*, 194 B.R. 410, 424–25 (Bankr. E.D. Tex. 1996) (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); *see also Phoenix Petrol.*, 278 B.R. at 393 (citing factors that courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (setting forth a non-exhaustive list of 19 categories of information that may be included in a disclosure statement).    Disclosure regarding all of the aforementioned topics is not necessary in every case. *See U.S. Brass*, 194 B.R. at 425; *see also Phoenix Petrol.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

comment on the Disclosure Statement in advance of solicitation which further ensured that the Disclosure Statement contained adequate information for their client.

34.     Accordingly, the Debtors submit that the Disclosure Statement contains sufficient information of the kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations.   Moreover, the Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated by the Plan, and should be approved.

### 2.     The Disclosure Statement Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law

35.     The Debtors commenced the solicitation of votes on the Plan from Holders of Claims in the Voting Classes prior to commencing these Chapter 11 Cases.[20]   To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code, as well as Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).   Similarly, section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless the plan (or a summary thereof) and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited.   For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with the solicitation.

36.     Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and interests prepetition without a court-approved disclosure statement if

---

[20]   Wong Decl. ¶ 21.

15

the solicitation complies with applicable nonbankruptcy law—including generally applicable federal and state securities laws or regulations—or, if no such laws exist, the solicited holders receive "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.[21]

37.    To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation procedures are exempt from securities law registration requirements pursuant to Section 4(a)(2), Regulation D, and/or Regulation S of the Securities Act, or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree. Specifically, Section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.

38.    To the extent that the prepetition solicitation of votes is deemed to be a private placement of securities, the Debtors have complied with the requirements of Section 4(a)(2) of the Securities Act, and/or Regulation D and Regulation S thereunder, as applicable, such that these transactions are exempt from the registration requirements under the Securities Act. Specifically, the prepetition solicitation was made to the Holders of Claims in Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims), which certified that it was one of the following: (a) a "qualified institutional buyer" (as such term is defined in Rule 144A of the Securities Act);

---

[21]    *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if— (1) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also id.* § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable non-bankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable non-bankruptcy law.").

(b) an "accredited investor" (as such term is defined in Rule 501(a) of Regulation D of the Securities Act); or (c) located outside the United States and was a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S of the Securities Act).

39.    Pursuant to section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the New Common Equity to be issued on account of the First Lien Claims and Picea HK Supply Agreement Claims will be freely transferable by the recipients thereof, subject to (a) any limitations that may be applicable to any Person receiving such securities that is an "affiliate" of the Reorganized Debtors as determined in accordance with applicable U.S. securities law and regulations or is otherwise an "underwriter" as defined in section 1145(b) of the Bankruptcy Code; (b) any transfer restrictions of such securities and instruments in the New Organizational Documents; and (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments.

40.    The shares of New Common Equity issued to an entity that is an "underwriter" with respect to such securities (as such term is defined in section 1145(b) of the Bankruptcy Code) or for which section 1145 of the Bankruptcy Code is otherwise not permitted or not applicable, will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or reliance on Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to the restrictions in the New Organizational Documents.

41.    Accordingly, the prepetition solicitation meets the requirements of applicable nonbankruptcy law and, thus, complies with section 1126(b)(1) of the Bankruptcy Code.

17

Moreover, no party in interest has objected to approval of the Disclosure Statement, much less on account of noncompliance with applicable nonbankruptcy law.

### C.    The Solicitation Procedures Complied with the Bankruptcy Code and the Bankruptcy Rules

42.    Prior to the Petition Date, the Debtors distributed the Solicitation Packages to the Eligible Holders,[22] which consisted of the Holders of Claims in each of the Voting Classes: Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims).  The Debtors distributed the Solicitation Packages (including the Ballots) only to the Eligible Holders prior to entry of the Scheduling Order.  Subsequently, after the entry of Scheduling Order and in accordance with the terms thereof, the Debtors caused the Solicitation and Voting Agent to distribute the Combined Notice and the Notice of Non-Voting Status to the members of the Non-Voting Classes, other than the Holders in Class 6 and Class 7, on December 17 and 18, 2025.[23]  The Notice of Non-Voting Status also included the Release Opt-In Form with instructions for such Holders to affirmatively opt into the Third-Party Release at their election.

43.    The solicitation was undertaken in accordance with sections 1125 and 1126 of the Bankruptcy Code.[24]  In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject

---

[22]    "Eligible Holder" means any Holder that is (a) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act) or (b) located outside the United States and is a person other than a "U.S. person" (as defined in Rule 902 under the Securities Act).

[23]    *See* Non-Voting Status Affidavits.

[24]    *See* 11 U.S.C. § 1125(b) (debtors may solicit votes following filing if the holders of claims or interested solicited are sent a summary of the plan and an approved disclosure statement); 11 U.S.C. § 1125(g) (debtors may commence solicitation prior to filing chapter 11 petitions); *see also id.* § 1126(b)(2) (holders of claims or interests that accepted or rejected a plan before the commencement of a chapter 11 case are presumed to accept or deemed to reject the plan so long as the solicitation provided adequate information).

a plan of reorganization.[25]  As set forth in more detail below, the solicitation complied with the Bankruptcy Code and the Bankruptcy Rules.

### 1. The Ballots Used to Solicit the Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules

44.    Bankruptcy Rule 3017(d) requires the debtor to transmit a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and equity security holders entitled to vote on the plan."[26]  Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[27]  As set forth in the Solicitation Affidavit, the Eligible Holders received the Solicitation Package, including the Ballots.[28]  The forms of Ballots distributed to the Voting Classes complied with the Bankruptcy Rules, are consistent with Official Form No. 314, and were conditionally approved by the Court in the Scheduling Order.[29]  Further, there have been no objections to the sufficiency of the Ballots.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

### 2. The Voting Record Date Complied with Bankruptcy Rules and the Scheduling Order

45.    When a debtor solicits votes prepetition, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[30]  For a postpetition solicitation,

---

[25]    *See* FED. R. BANKR. P. 3017(d).

[26]    *See id.*

[27]    *See id.* at 3018(c).

[28]    *See* Solicitation Affidavit.

[29]    *See* Scheduling Order.

[30]    FED. R. BANKR. P. 3018(b).

19

the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date the order approving the disclosure statement is entered or on another date fixed by the court . . . after notice and a hearing."[31]    The Scheduling Order, the Disclosure Statement, and the Ballots clearly identify December 13, 2025, as the Voting Record Date.[32]

### 3.    The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Scheduling Order

46.    The Debtors' solicitation period complied with Bankruptcy Rule 3018.  First, as set forth above, the Debtors caused the Plan and Disclosure Statement to be transmitted to the Holders of Claims in each of the Voting Classes in accordance with Bankruptcy Rule 3018(b).[33]  Second, the solicitation period complied with the deadlines set forth in the Scheduling Order and were adequate under the particular facts and circumstances of this case and applicable bankruptcy law. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 3018.

### 4.    The Debtors' Vote Tabulation Was Appropriate and Complied with the Scheduling Order

47.    The Debtors request that the Court find that the tabulation of votes was completed in a manner consistent with the Solicitation Procedures conditionally approved in the Scheduling Order and in accordance with applicable bankruptcy law.    As described in the Solicitation Procedures and the Voting Report, the Solicitation and Voting Agent used standard tabulation procedures in tabulating votes from Eligible Holders.  Specifically, the Solicitation and

---

[31]    *Id.* at 3018(a).

[32]    *See* Scheduling Order ¶ 15; Exs. 1, 2, 3-A, 3-B; Disclosure Statement, Art. XI.

[33]    *See* Solicitation Affidavit.

20

Voting Agent reviewed and tabulated all valid Ballots received through the Voting Deadline, each in accordance with the court-approved Solicitation Procedures and the Disclosure Statement.[34]

### 5.  Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Scheduling Order

48.    As further described in the Debtors' *Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* [Docket No. 14] (the "Scheduling Motion"), certain Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Existing Equity Interests) were not provided a Solicitation Package because such Holders are conclusively presumed to accept or deemed to reject the Plan pursuant to sections 1126(f) and (g) of the Bankruptcy Code.    In the Scheduling Order, the Court conditionally approved the Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package to Holders of Claims or Interests presumed to accept or deemed to reject the Plan.  As set forth above, the Court-approved Combined Notice was sent to the Debtors' full

---

[34]    *See* Voting Report ¶¶ 9, 10.

creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Solicitation and Voting Agent's website.  In addition, the Debtors sent the Court-approved Notice of Non-Voting Status with an attached Release Opt-In Form to all Holders of Claims and Interests in Non-Voting Classes in accordance with the Scheduling Order, except for Holders of Claims in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), because such Holders are Affiliates of the Debtors and the Scheduling Order granted the Debtors a waiver of the requirement to provide Classes 6 and 7 with such notice as a result thereof.

### 6. Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith

49.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, . . . is not liable, on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[35]  As set forth in the Disclosure Statement and the Scheduling Motion, and as demonstrated by the Debtors' compliance with the Scheduling Order,[36] the Debtors at all times solicited acceptances and rejection of the Plan in good faith and in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

---

[35]    11 U.S.C. § 1125(e).

[36]    *See generally* Solicitation Affidavit.

## II.    The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should Be Confirmed

50.    In order to confirm a plan, a court must find that both the plan and the debtor comply with each of the requirements of section 1129 of the Bankruptcy Code.    The debtor must demonstrate such compliance by a preponderance of the evidence.[37]    The Debtors submit that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and should, therefore, be confirmed.[38]

### A.    Section 1129(a):  The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code

#### 1.    Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code

51.    Section 1129(a)(1) of the Bankruptcy Code requires a plan to comply with all applicable provisions of the Bankruptcy Code, including the rules governing the classification of claims and interests (section 1122) and the provisions dictating the contents of a plan (section 1123).[39]  The Plan complies with these provisions of the Bankruptcy Code.

---

[37]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

[38]    Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code do not apply to the Debtors and are not discussed herein.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations to which the Debtors are not subject. *See* 11 U.S.C. § 1129(a)(14).  Similarly, section 1129(a)(15) of the Bankruptcy Code applies only to "individual[s]" as that term is defined in the Bankruptcy Code, and not corporate entities such as the Debtors.  Finally, section 1129(a)(16) of the Bankruptcy Code governs property transfers by entities that, unlike the Debtors, are something other than a "moneyed, business, or commercial corporation or trust."

[39]    11 U.S.C. §§ 1122, 1123, 1129(a)(1). *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

     **(a)**      **Section 1122:    The Plan's Classification Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code**

52.     The Plan's classification of Claims and Interests complies with section 1122(a) of the Bankruptcy Code, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[40]  Substantial similarity, however, does not require that claims or interests in a particular class be identical, or that all similarly situated claims or interests must receive the same plan treatment.[41]  Courts afford a plan proponent with "significant flexibility" in classifying claims and interests under section 1122(a), provided that there is a reasonable, non-gerrymandering basis for the classification scheme and all claims or interests within a particular class are substantially similar.[42]

---

[40]    11 U.S.C. § 1122(a).

[41]    *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("Separate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), No. 03-49462, 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one rule regarding separate classification of similar claims under section 1122, which is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[42]    *See, e.g.*, *In re Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code requires that claims be substantially similar within a particular class, there is no requirement within Section 1122 or elsewhere in the Code that all substantially similar claims be included within a particular class.").  Courts have identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co.* v. *Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes).

53.    Here, the Plan appropriately classifies Claims and Interests as follows:[43]

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Picea HK Supply Agreement Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept / Deemed to Reject)* |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept / Deemed to Reject)* |
| 8 | Existing Equity Interests | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

54.    The Plan's classification of Claims and Interests is reasonable and complies with the Bankruptcy Code. All Claims and Interests within each Class have substantially similar rights against the Debtors. The Plan provides for the separate classification of Claims against and Interests in the Debtors based upon the differences in such Claims' and Interests' legal nature or priority. First Lien Claims and Picea HK Supply Agreement Claims have been classified separately because of the nature of such Claims and their unique proposed treatment under the Plan, as negotiated in connection with the Restructuring Support Agreement.[44] Moreover, the classification structure generally corresponds to the Debtors' prepetition capital structure and designates Claims and Interests into Classes based on the instruments giving rise to such Claims and Interests. Further, Intercompany Claims, Intercompany Interests, and Existing Equity Interests have been classified separately due to their distinct nature and their separate proposed treatment under the Plan. Accordingly, the Plan complies with section 1122 of the Bankruptcy Code.

25

> **(b)      Section 1123:      The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code**

55.     Section 1123 of the Bankruptcy Code sets forth both mandatory and optional provisions for a chapter 11 plan.  For the reasons set forth below, the Plan:  (a) satisfies each of the mandatory requirements of section 1123(a) of the Bankruptcy Code; (b) includes several of the optional provisions permitted under section 1123(b) of the Bankruptcy Code; and (c) includes other provisions not inconsistent with other applicable provisions of the Bankruptcy Code within the meaning of section 1123(b)(6) of the Bankruptcy Code.

> **(i)      Section 1123(a):      The Plan Satisfies the Mandatory Provisions of Section 1123(a) of the Bankruptcy Code**

56.     The Plan satisfies the seven mandatory requirements of section 1123(a) of the Bankruptcy Code:

(a)     Section 1123(a)(1):  The first requirement of section 1123(a) is that the plan specify the classification of claims and interests.[45]  Article III designates Classes of Claims and Interests as required by section 1123(a)(1) of the Bankruptcy Code.

(b)     Sections 1123(a)(2) and (3):  The second and third requirements of section 1123(a) are that the plan specify (i) the status (*i.e.*, impaired or unimpaired) of such claims and interests and (ii) the precise nature of their treatment under the plan.[46]  The Plan meets these requirements by identifying each Unimpaired and Impaired Class in Article III of the Plan.

(c)     Section 1123(a)(4): The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."[47]  Article III provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable

---

[43]    In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified and are separately treated under the Plan.

[44]    Wong Decl. ¶ 12.

[45]    *See* 11 U.S.C. § 1123(a)(1).

[46]    *See id.* § 1123(a)(2), (3).

[47]    *See id*. § 1123(a)(4).

treatment of such Claim or Interest as required by section 1123(a)(4) of the Bankruptcy Code.  This applies to Holders within each Class.

(d)    Section 1123(a)(5):  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[48]  Article IV, in conjunction with various other Plan provisions, provides adequate means for implementing the Plan as required by section 1123(a)(5) of the Bankruptcy Code, including, *inter alia*: (i) consummation of the Restructuring Transactions, and generally allowing for all corporate action necessary to effectuate the Restructuring Transactions; (ii) the funding of distributions under the Plan with Cash on hand on the Effective Date and the New Common Equity; (iii) assumption of the New Picea Supply Agreement; (iv) the continued corporate existence of the Debtors, except as otherwise provided in the Plan or the Plan Supplement; (v) the vesting of assets in the Reorganized Debtors; (vi) the assumption, and/or assumption and assignment of Executory Contracts and Unexpired Leases as set forth in the Plan and Plan Supplement; (vii) the authorization and approval of all corporate actions contemplated under the Plan; (viii) the implementation of the transactions set forth in the Restructuring Transactions Memorandum, (ix) the release of guarantees and liens under the Amended First Lien Credit Agreement; (x) the adoption of the New Organizational Documents; (xi) the cancellation of existing securities and agreements; (xii) with respect to securities distributed under the Plan, the exemption from registration requirements pursuant to section 1145 of the Bankruptcy Code; (xiii) the expiration of the terms of the members of the Debtors' boards of directors and appointment of the initial boards of directors or managers of the Reorganized Debtors, including the New Board; (xiv) the preservation of certain of the Debtors' Causes of Action, including those set forth in the Schedule of Retained Causes of Action; (xv) issuance of the New Common Equity; and (xvi) the exemption from transfer taxes pursuant to section 1146 of the Bankruptcy Code.

(e)    Section 1123(a)(6):  The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter, if the debtor is a corporation, that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[49]  This requirement is satisfied because Article IV.K of the Plan provides that the New Organizational Documents shall prohibit the issuance of any non-voting equity.[50]  Accordingly, the Debtors respectfully submit that the

---

[48]   *See id*. § 1123(a)(5). Section 1123(a)(5) specifies that adequate means for implementation of a plan may include, among other things:  (a) retention by the debtor of all or part of its property; (b) the transfer of property of the estate to one or more entities; (c) cancellation or modification of any indenture; (d) curing or waiving of any default; (e) amendment of the debtor's charter; or (f) issuance of securities for cash, for property, for existing securities, in exchange for claims or interests, or for any other appropriate purpose.

[49]   *See id*. § 1123(a)(6).

[50]   *See* Plan Supplement, Ex. B.

27

requirements of section 1123(a)(6) of the Bankruptcy Code, to the extent they are applicable, have been satisfied.

(f)    Section 1123(a)(7):  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[51]   Article IV.L provides that following the Effective Date, the New Board of Reorganized iRobot will be appointed in accordance with the New Organizational Documents.   Further, the Debtors disclosed in the Plan Supplement the known proposed members of the New Board.[52]   The existing officers of each Reorganized Debtor, as applicable, shall continue in their existing positions as of the Effective Date, subject to the terms of the New Organizational Documents.  As required by sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code, the appointment of the New Board is consistent with the interests of creditors and equity security holders and complies with public policy with respect to the manner of selection of the directors for the New Board.[53]

### (ii)    Section 1123(b):  The Plan Satisfies the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

57.    Section 1123(b) of the Bankruptcy Code allows a plan to include a variety of different permissive provisions.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[54]  Each of the Plan's permissive provisions comport with these requirements:

(a)    Section 1123(b)(1):  Per section 1123(b)(1) of the Bankruptcy Code, Article III classifies and describes the treatment for Claims and Interests under the Plan, and identifies which Claims and Interests are Impaired or Unimpaired.

---

[51]   *See* 11 U.S.C. § 1123(a)(7).

[52]   *See* Plan Supplement, Ex. C.

[53]   *See generally* 11 U.S.C. § 1123(a)(1)–(7).

[54]   *See id*. § 1123(b)(1)–(3), (6).

(b)   Section 1123(b)(2):  As set forth in section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not previously rejected.[55]  Pursuant to Article V of the Plan, and except as otherwise provided therein, all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date except for any Executory Contract and Unexpired Lease that (i) was previously assumed or rejected by the Debtors, pursuant to an Order of the Court, (ii) previously expired or terminated pursuant to its terms, (iii) is the subject of a motion to reject Filed on or before the Effective Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.  The Plan provides that entry of the Confirmation Order by the Court shall constitute approval of such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(c)   Section 1123(b)(3):  Per section 1123(b)(3)(A) of the Bankruptcy Code, Article VIII.C of the Plan provides for a release of certain of the Debtors' Claims and Causes of Action.  In addition, per section 1123(b)(3)(b) of the Bankruptcy Code, Article IV.H and the Plan Supplement provide that, except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or pursuant to any other Final Order of the Court, all of the Debtors' Causes of Action shall vest in each respective Reorganized Debtor and the Reorganized Debtors will retain, and may compromise or settle all such Causes of Action.[56]

(d)   Section 1123(b)(5):  As permitted by section 1123(b)(5) of the Bankruptcy Code, Article III modifies the rights of Holders of Claims as set forth therein.

### (iii)   Section 1123(b)(6):  The Discretionary Contents of the Plan are Permitted by Section 1123(b)(6) of the Bankruptcy Code

58.    Section 1123(b)(6) of the Bankruptcy Code also authorizes the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[57]  The Plan includes several such discretionary provisions, including (a) various terms discharging, releasing, and enjoining the pursuit of Claims, and (b) a consensual Third-Party Release of certain potential Claims.  The release and exculpation provisions result from extensive good-faith and arm's-length negotiations by and among the Debtors and certain of the

---

[55]   *See id*. § 1123(b)(2).

[56]   *See* Plan, Art. IV.H; Plan Supplement, Ex. D.

[57]   11 U.S.C. § 1123(b)(6).

Released Parties.[58]   Such provisions are consistent with applicable Third Circuit case law and precedent in this district, comply with the Bankruptcy Code in all respects, were a material inducement for parties to enter into the Restructuring Support Agreement, are supported by Picea, the Debtors' key stakeholder, and are in the best interests of the Debtors' Estates and these Chapter 11 Cases.  In addition, the Third-Party Release contained in the Plan is a consensual, opt-in release and is fully consistent with Third Circuit precedent.  None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

59.    The Debtor Release.  Article VIII.C of the Plan provides for a release of any and all Claims and Causes of Action, including contingent, unliquidated, unknown, and derivative claims, of the Debtors, the Reorganized Debtors, and their Estates, against the Released Parties in connection with, among other things and in whole or in part, the Debtors, the Reorganized Debtors, their Estates, the Plan, the Restructuring Transactions, or these Chapter 11 Cases (the "Debtor Release").

---

[58]    Pursuant to Article I.96 of the Plan, the term "Released Parties" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each First Lien Secured Party; (d) Picea Robotics; and (e) all Holders of Claims and Existing Equity Interests that receive a notice of non-voting status who affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt-in to grant the releases provided in the Plan; (f) with respect to each of the Entities in the foregoing clauses (a) through (e), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (g) with respect to each of the Entities in the foregoing clauses (a) through (e), each such Entity's current and former predecessors, participants, successors, assigns, subsidiaries, direct and indirect equityholders, interest holders, limited partners, co-investors, funds (including affiliated investment funds or investment vehicles), portfolio companies, and management companies; and (h) with respect to each of the Entities in the foregoing clauses (a) through (g), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided*, that, in each case, an Entity shall not be a Releasing Party if it fails to opt-in to the releases contained in this Plan, if permitted to opt-in.

60.     Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may include "the settlement or adjustment of any claim or interest belonging to the Debtor or to the estate."[59]   Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[60]

61.     In addition to analyzing debtor releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a "debtor release" in light of five "*Zenith* factors" in the context of a chapter 11 plan:[61]

- whether there is an identity of interest between the debtor and the third party;

- whether the third party has made a substantial contribution to the debtor's reorganization;

- whether the release is essential to the debtor's reorganization;

- whether a substantial majority of creditors support the release; and

- whether the plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.

---

[59]   *See* 11 U.S.C. § 1123(b)(3)(A); *In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008) (internal citations omitted); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within the reasonable range of litigation possibilities).

[60]   *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [of whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citation omitted).

[61]   *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)).

No one factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[62]

62.     The Debtor Release satisfies the applicable legal standards.  First, the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan because the Debtors assessed the Debtor Release and the potential claims subject to the Debtor Release and determined on a fully informed basis that the Debtor Release is fair, reasonable, and in the best interests of the Debtors' Estates.  Importantly, prior to the Petition Date, in connection with negotiating the terms of the Debtor Release, the board of directors of Debtor iRobot Corporation established an investigation committee (the "Investigation Committee") and appointed Mr. Neal Goldman, an independent director of Debtor iRobot Corporation, as the sole member of the Investigation Committee.  The Investigation Committee assessed potential claims and causes of action the Estates could assert against the Debtors' insiders (as defined in section 101(31) of the Bankruptcy Code).[63]  Based upon the assessment by the Investigation Committee and its advisors, the Investigation Committee concluded that the Debtor Release of insiders was justified because (a) no colorable claims against the insiders were identified, and (b) the pursuit of non-colorable claims by a third party on a derivative basis would be an unjustifiable use of the Reorganized Debtors' resources, and potentially detrimental to the Reorganized Debtors due to the insiders' indemnity rights that are not impaired under the Plan.[64]

63.     Furthermore, the Plan (including the Debtor Release) complies with the Bankruptcy Code's absolute priority rule, and, notably, General Unsecured Claims are Unimpaired

---

[62]    *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[63]    *See* Wong Decl. ¶ 51.

[64]    *See id.*

and deemed to accept the Plan.  While Class 8 (Existing Equity Interests) is deemed to reject the Plan, the Debtor Release does not result in any junior Classes receiving or retaining any property on account of junior Claims or Interests, and without the Debtor Release and consummation of the Plan, Holders of General Unsecured Claims would receive no recovery on account of their Claims. Thus, the Debtor Release is fair and equitable, and in line with Third Circuit precedent.  In addition, the Debtor Release is in the best interest of and provides a material benefit to the Estates.  As stated above, the Debtors are not aware of the existence of any Claims or Causes of Action of any value being released by the Debtors.  The Plan, including the Debtor Release, was negotiated in good faith and at arm's length by sophisticated entities that were represented by able advisors and that each conditioned their support for and acceptance of the Plan, among other things, on the grant of the Debtor Release and the Third-Party Release (discussed below).[65]  Each Released Party has served an integral role in these Chapter 11 Cases and made substantial concessions that underpin the consensual resolution of these Chapter 11 Cases, which will enable the Debtors to expeditiously exit bankruptcy with a deleveraged capital structure.  Further, the Released Parties may be unwilling to support the Plan without the Debtor Release.[66]  Accordingly, the Debtor Release is fair, equitable, and in the best interest of the Estates, and should therefore be approved.

64.    Additionally, the *Zenith* factors support the proposed Debtor Release here.  *First*, there is an identity of interest between the Debtors and the Released Parties.  The Released Parties include the Debtors' stakeholders and proponents, such as Picea, that are and have been critical participants in the Plan process and who share a common goal in seeing the consummation and implementation of the Plan and the Debtors' successful reorganization.  Picea will be the sole

---

[65]    *Id.* ¶ 50.

[66]    *Id*.

33

equity holder of Reorganized Debtors upon the occurrence of the Effective Date, further cementing their shared identity.  Moreover, other Released Parties that are related parties of the Debtors (*e.g.*, the Debtors' current and former board members and officers) have served the Debtors in connection with these Chapter 11 Cases and worked to maximize the value of the Debtors' Estates for the benefit of all stakeholders.  Further, the Debtors will assume certain indemnification obligations in favor of the Released Parties under the Plan, including those of the Debtors' current and former directors and officers.[67]  Thus, a lawsuit commenced against these individuals would effectively be a lawsuit against the Reorganized Debtors, effectuating an end run around the "fresh start" the Debtors seek to obtain as part of this process and depleting the Reorganized Debtors' assets.  Accordingly, the Debtors submit that the first *Zenith* factor is satisfied with respect to the Released Parties.

65.    *Second*, the Released Parties have made and will continue to make substantial contributions and provide integral support to the Debtors throughout these Chapter 11 Cases.  For example, the Released Parties who are directors and officers of the Debtors have (a) operated the Debtors' business throughout these Chapter 11 Cases, (b) worked diligently to stabilize the Debtors' business and preserve the going-concern value for the benefit of all stakeholders, and (c) helped to develop consensus regarding the restructuring strategy and navigate the Debtors through the restructuring process.  Moreover, recognizing that the most value maximizing strategy was to implement a restructuring through a prepackaged plan, existing members of the Debtors' management made materials concessions under their existing employment agreements to put the Company in a position to implement the prepackaged restructuring.[68]

---

[67]    *See Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release."); *see also* Wong Decl. ¶ 51.

[68]    Wong Decl. ¶ 50.

34

66.     In addition, Picea negotiated and executed the Restructuring Support Agreement with the Debtors, pursuant to which Picea agreed to support confirmation of the Plan, permit the consensual use of Cash Collateral, and take all necessary steps to consummate and facilitate implementation of the Restructuring Transactions to position the Debtors for success post-emergence.  Without Picea's material concessions and support for the Plan, the Debtors would be unable to pay the Holders of General Unsecured Claims in full in the ordinary course.

67.     These Released Parties' substantial concessions and contributions have enabled the Debtors to develop their restructuring strategy and work toward formulating and promptly executing the Plan on a consensual basis with their key stakeholders and emerge from these Chapter 11 Cases as soon as reasonably practicable.  Accordingly, the Debtors submit that the second *Zenith* factor is satisfied.

68.     *Third*, the Debtor Release is essential to the Plan itself.  Absent the Debtor Release, it is highly unlikely that Picea would have entered into the Restructuring Support Agreement and agreed to support the Plan and the Restructuring Transactions.[69]  For the other Released Parties, the Debtor Release was similarly a material inducement to, and condition of, the concessions and substantial contributions made to effectuate the restructuring.  The Debtors would not have been able to build consensus with respect to the Plan and the transactions contemplated thereby, including at the outset of these cases, without the Debtor Release.  Accordingly, the Debtors submit that the third *Zenith* factor is satisfied.

---

[69]   *See, e.g.*, *Coram Healthcare*, 315 B.R. at 335 ("The releases given to the Noteholders are an essential part of the Plan, since they would not provide the funding without the releases.").

69.     *Fourth*, no party has objected to the Debtor Release and the Plan has been unanimously accepted by the Voting Classes.  Accordingly, the Debtors submit that the fourth *Zenith* factor is satisfied.

70.     *Fifth*, all Holders of Allowed Claims (except for Picea) will have their Claims either paid in full or reinstated on the Effective Date, preserving all of their legal, equitable, and contractual rights.  The Debtor Release, which includes the release of certain derivative Claims and Causes of Action of the Debtors, the Reorganized Debtors, and their Estates, including any successors thereto, against the Released Parties, is an integral component to the Restructuring Transactions and induced Picea to voluntarily accept substantial impairment while other Holders of Claims are receiving payment in full.  The Debtors' ability to provide meaningful recoveries to all Holders of Claims notwithstanding the substantial impairment of their senior creditor is due in part to the inclusion of the Debtor Release.  Accordingly, the Debtors submit that the fifth *Zenith* factor is satisfied.

71.     Having satisfied the *Zenith* factors, the Debtors respectfully submit that the Debtor Release is a valid exercise of the Debtors' business judgment, is fair and reasonable, falls well within the range of customarily approved releases, and should be approved.

72.     Third-Party Release.  Article VIII.D of the Plan provides for a consensual release of any and all Claims and Causes of Action by the Releasing Parties[70] against the Released Parties in connection with, among other things, the Debtors, the Plan, the Restructuring Transactions, and

---

[70]   Pursuant to Article I.97 of the Plan, the term "Releasing Parties" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each First Lien Secured Party; (d) Picea Robotics; and (e) all Holders of Claims and Existing Equity Interests that receive the notice of non-voting status and, in each case, who do affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt to grant the releases provided in the Plan.

36

these Chapter 11 Cases (the "Third-Party Release").  The Third-Party Release is fully consensual and should be approved.

73.    In the *Purdue* decision, the Supreme Court recognized the validity of third-party releases when they are consensual.[71]  Courts in this jurisdiction routinely approve third-party release provisions if, as here, they are consensual.[72]  The determination as to whether a third-party release is consensual ultimately relies on the particular circumstances at issue in a particular case.[73]

74.    Here, it is without question that the Third-Party Release contained in the Plan is consensual.  The Releasing Parties subject to the Third-Party Release either (a) affirmatively agreed to be bound by the Third-Party Release in executing the Restructuring Support Agreement, or (b) affirmatively agreed to be bound to the Third-Party Release by executing and submitting a Release Opt-In Form to the Solicitation and Voting Agent.  Accordingly, the Third-Party Release is fully consensual under applicable authority in this district.  In soliciting votes on the Plan, the Debtors sent Ballots to the Holders of Claims in the Voting Classes, which stated conspicuously in bold, capitalized typeface that certain releases were contained in the Plan and provided instructions for opting into such releases.[74]  The Debtors also sent Holders of Claims and Interests in the Non-Voting Classes the Notice of Non-Voting Status, including the Release Opt-In Form,

---

[71]    *See Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204, 225–227 (2024).

[72]    *See, e.g.*, *In re Exactech, Inc.*, No. 24-12441 (LSS), Docket No. 1647 (Bankr. D. Del. Sept. 17, 2025); *In re WW Int'l, Inc.*, Case No. 25-10829 (CTG), Docket No. 177 (Bankr. D. Del. June 17, 2025); *In re Franchise Group, Inc.*, Case No. 24-12480 (LSS), Docket No. 1596 (Bankr. D. Del. June 2, 2025); *In re Seaplane Debtor 1, Inc.*, Case No. 24-10703(CTG), Docket No. 680 (Bankr. D. Del. Dec. 11, 2024); *In re BAWT Enterprises LLC*, Case No. 24-12215 (MFW), Docket No. 68 (Bankr. D. Del. Oct. 28, 2024); *In re Basic Fun, Inc.*, Case No. 24-11432 (CTG), Docket No. 261 (Bankr. D. Del. Oct. 21, 2024); *In re Smallhold, Inc.*, Case No. 24-10267 (CTG), Docket No. 288 (Bankr. D. Del. Sept. 25, 2024).

[73]    *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305–06.

[74]    *See* Scheduling Order, Exs. 3-A, 3-B.

which provided certain Holders in the Non-Voting Classes the opportunity to opt into the Third-Party Release.

75. Moreover, the scope of the Third-Party Release is appropriately tailored to the facts and circumstances of these Chapter 11 Cases because it explicitly does not provide a release for (a) post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, or (b) any Claims related to any act or omission that is determined to have constituted actual fraud, willful misconduct, or gross negligence as determined by a Final Order of a court of competent jurisdiction. In addition, the Third-Party Release is applicable only to the "Releasing Parties," a definition that is narrowly tailored to only include Holders of Claims or Interests who affirmatively opt-in to the releases.[75]

76. The Third-Party Release was an integral, negotiated term of the Restructuring Support Agreement and Plan, and facilitated the participation and substantial contributions by critical parties in interest in both the Plan process and the chapter 11 process more generally. Through these contributions, the Debtors will deleverage their balance sheet by approximately $257 million which will allow the Debtors to emerge from these Chapter 11 Cases as reorganized entities with no funded debt to the benefit of all the Debtors' stakeholders. Such accomplishment is a direct result of the significant contributions of and, in some cases, material concessions made by, the Released Parties. Such substantial contributions include, among other things: (a) compromising Claims and accepting Impaired recoveries and waiving recoveries on material Claims entirely; (b) permitting the use of encumbered assets and Cash Collateral during

---

[75]    *See infra* note 70.

these Chapter 11 Cases; and (c) negotiating and supporting the Plan and other documents essential to the success of these Chapter 11 Cases.[76] Furthermore, the Non-Voting Classes (excluding Holders of Existing Equity Interests) are entitled to receive payment in full on account of their respective Claims, a material consideration such parties are receiving in this process, due in large part to the various agreements and concessions made by Picea, which required the Third-Party Release as an integral part of the Plan and the Restructuring Transactions. Holders of General Unsecured Claims would have been materially impaired if Picea did not agree to pursue the prepackaged Restructuring Transactions, which required the Third-Party Release. These contributions will allow for a holistic restructuring that will enable the Debtors to significantly reduce their debt obligations and emerge with sufficient operational liquidity following the Effective Date.[77]

77. Accordingly, the Debtors submit that the Third-Party Release is (a) entirely consensual, (b) appropriately tailored under the circumstances of these Chapter 11 Cases, (c) justified by the record of these Chapter 11 Cases, and (d) consistent with the accepted practices within the Third Circuit, and, therefore, should be approved. No party in interest has asserted otherwise or objected to the approval of the Third-Party Release.

---

[76]   *See* Wong Decl. ¶¶ 54–56.

[77]   As noted above, the Debtors' directors and officers: (a) made substantial and valuable contributions to the Debtors' restructuring and the Estates, including extensive negotiations with various stakeholders, and ensured the uninterrupted operation of the Debtors' business during these Chapter 11 Cases; (b) invested significant time and effort to make the Debtors' restructuring a success and preserve the value of the Estates in a challenging operating environment; (c) attended the hearing on "first day" motions; (d) attended numerous board meetings related to the restructuring and directed the restructuring negotiations that led to the Restructuring Support Agreement and the Plan; (e) are entitled to indemnification from the Debtors under applicable law, organizational documents, and agreements; (f) invested significant time and effort in the preparation of the Plan, the Disclosure Statement, all supporting analyses, and the numerous other pleadings filed in these Chapter 11 Cases, thereby ensuring the smooth administration of these Chapter 11 Cases; and (g) provided material concessions they would otherwise be entitled under their current employment contracts with the Debtors.

78.     Exculpation. Courts within the Third Circuit have held that exculpation provisions are appropriate when limited to estate fiduciaries and exclude conduct constituting gross negligence or willful misconduct.[78]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties, *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[79]

79.     An exculpation provision represents a legal determination that flows from several different findings a bankruptcy court must reach in confirming a plan, as well as the statutory exculpation in section 1125(e) of the Bankruptcy Code.[80]  Thus, once the court makes a finding of good faith, it is appropriate to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[81]  Exculpation provisions, therefore, properly prevent future collateral attacks against estate fiduciaries.

80.     Article VIII.E of the Plan contains a customary exculpation benefitting the Exculpated Parties for any Cause of Action or Claim arising out of or relating to these Chapter 11 Cases and the agreements made in connection therewith (the "Exculpation").  The

---

[78]    *See, e.g.*, *Wash. Mut.*, 442 B.R. at 350–51 (holding that exculpation must be limited to estate fiduciaries and conduct not constituting gross negligence or willful misconduct).

[79]    *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as provided for under the Plan); *In re Spansion Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[80]    *See* 11 U.S.C. § 1125(e); *see also* 28 U.S.C. § 157(b)(2)(L) (confirmations of plans are core proceedings).

[81]    *See PWS*, 228 F.3d at 246–47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties") (internal citations omitted).

Exculpation carves out acts or omissions that are determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud.[82]

81.    Here, the Exculpation is appropriate as it represents an integral component of the Plan, is the product of good-faith, arm's-length negotiations among various parties (including the key constituents of these Chapter 11 Cases), is properly and narrowly tailored in time and scope under applicable law, and is authorized pursuant to the Court's authority under sections 105, 1123(b), 1125, and 1129(a)(1) of the Bankruptcy Code.    Moreover, the Exculpation was revised to address and resolve informal comments received from the U.S. Trustee.

82.    <u>Injunction</u>.    Article VIII.F of the Plan contains an injunction provision that permanently enjoins all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to the Exculpation, from, among other things, commencing or continuing any action against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, and/or the Released Parties on account of such Claims or Interests (the "<u>Injunction</u>").    The Injunction is necessary to implement, preserve, and enforce the Plan's release, discharge, exculpation, and gatekeeping provisions, which are integral to the Plan.    Furthermore, the Injunction is properly tailored to achieve its objective and only encompasses Claims or Causes of Action that have been consensually released.    The Court should, therefore, approve the Injunction in connection with approving the discharge, release, and exculpation provisions included in the Plan.

---

[82]    The above description is only a summary of the Exculpation, which is qualified entirely by the language of the Exculpation and the applicable definitions in the Plan, which shall control.

41

**(iv)      Section 1123(d): The Plan's Cure Process Is Appropriate under Section 1123(d)**

83.     Section 1123(d) of the Bankruptcy Code provides that amounts necessary to cure defaults under a plan shall be "determined in accordance with the underlying agreement and applicable nonbankruptcy law."[83]   Article V.C of the Plan provides for the satisfaction of the Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.   Specifically, the Debtors or the Reorganized Debtors, as applicable, shall pay the undisputed portion of Cure Claims, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter, for Executory Contracts and Unexpired Leases assumed as of the Effective Date, (b) in the ordinary course of the Debtors' business in accordance with the terms of such Executory Contract or Unexpired Lease, or (c) the assumption effective date, if different than the Effective Date.[84]   Any disputed Cure Claim will be determined in accordance with the procedures set forth in Article V.C of the Plan and applicable law.   As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, and therefore complies with section 1123(d) of the Bankruptcy Code.   Importantly, no party in interest has objected to the Plan on such grounds.

84.     Based upon the foregoing, the Plan complies fully with sections 1122 and 1123, and, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

---

[83]   11 U.S.C. § 1123(d).

[84]   *See* Plan, Art. V.C.

        **2.**      **Section 1129(a)(2):**      **The Debtors Have Complied with the Bankruptcy Code**

85.      As confirmed by its legislative history, section 1129(a)(2) of the Bankruptcy Code requires compliance with the disclosure, solicitation, and voting requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[85]

        **(a)**      **Section 1125:**      **Postpetition Disclosure Statement and Solicitation**

86.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[86]  As set forth above, and as evidenced by the Voting Report and the Solicitation Affidavit, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.[87]  Following the execution of the Restructuring Support Agreement and immediately prior to commencing these Chapter 11 Cases, the Solicitation and Voting Agent solicited votes on the Plan consistent with the subsequently Court-approved Solicitation Procedures.[88]  In addition, the Debtors and their professionals acted in good faith in all respects in

---

[85]    *See* 11 U.S.C. § 1129(a)(2); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[86]    11 U.S.C. § 1125(b).

[87]    *See generally supra* Voting Report; Solicitation Affidavit.

[88]    *See generally* Solicitation Affidavit.

connection with the solicitation of votes on the Plan and the tabulation of such votes.[89] Accordingly, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.[90]

### (b)  Section 1126:  Acceptance of the Plan

87.    Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a plan and determining acceptance thereof.  Pursuant to section 1126, only holders of allowed claims or equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.[91]  As set forth above, the Debtors solicited acceptances of the Plan only from the Holders of Claims in the Voting Classes, which are the only Classes that are Impaired and entitled to vote on the Plan.[92]  The Debtors did not solicit votes to accept or reject the Plan from the Holders of Claims and Interests in the Non-Voting Classes, all of which are either (a) Unimpaired and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and receiving no recovery under the Plan and, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

88.    Sections 1126(c) and (d) of the Bankruptcy Code specify that holders of an impaired class of claims or interests must vote in favor of a plan by at least two-thirds in amount

---

[89]    *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also id.* § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable non-bankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable non-bankruptcy law.").

[90]    *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding section 1129(a)(2) satisfied where the debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to plan).

[91]    *See* 11 U.S.C. § 1126(a), (f), (g).

[92]    *See* Solicitation Affidavit; Voting Report ¶ 7.

and more than one-half in number of the allowed claims, or interests, of such class to accept the plan.[93]  Based on the voting results demonstrated through the Voting Report, the Holders of Claims in Classes 3 and 4 unanimously voted to accept the Plan, and, therefore, voted in excess of the statutory threshold.[94]  Based on the foregoing, the requirements of sections 1125 and 1126 of the Bankruptcy Code have been satisfied, and thus, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### 3. Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Is Not by Any Means Forbidden by Law

89.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."[95]  For the reasons set forth above, the Debtors have proposed the Plan in good faith.  Furthermore, the Plan is "not by any means forbidden by law," and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law.  Accordingly, section 1129(a)(3) of the Bankruptcy Code is satisfied.

### 4. Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval

90.     Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, . . . be[] approved by, or [be] subject to the approval of, the court as reasonable."[96]  Section 1129(a)(4) has been construed to require

---

[93]   *See* 11 U.S.C. § 1126(c)–(d).

[94]   Voting Report, Ex. A.

[95]   11 U.S.C. § 1129(a)(3).

[96]   *Id*. § 1129(a)(4).

that all payments of estate professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court.[97]

91.    Article II.B of the Plan provides that all Professional Fee Claims must be reviewed and approved by the Court as reasonable pursuant to final fee applications.  Article XI(b) of the Plan provides that the Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or [the] Plan."[98]  Accordingly, the applicable provisions in the Plan comply with section 1129(a)(4) of the Bankruptcy Code.

### 5.    Section 1129(a)(5):    The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

92.    Section 1129(a)(5) of the Bankruptcy Code requires (a) that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor, (b) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (c) to the extent there are any insiders that will be retained or employed by the Debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.[99]

93.    As part of the Plan Supplement, the Debtors have disclosed the identities and affiliations of the known individuals that are proposed to serve on the New Board following the

---

[97]    *Lisanti Foods*, 329 B.R. at 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court.").

[98]    *See* Plan, Art. II.B, XI(b).

[99]    11 U.S.C. § 1129(a)(5).

Effective Date to the extent known prior to the Combined Hearing.  Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

### 6. Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes

94.    Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."[100]  Section 1129(a)(6) is inapplicable to these Chapter 11 Cases, as the Plan does not provide for any rate changes.

### 7. Section 1129(a)(7):  The Plan Satisfies the "Best Interests" Test

95.    Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code at that time.[101]  This "best interests test" is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the Debtors' plan of reorganization that rejects the plan.[102]  Because the best interests test by its terms does not apply to Classes of Unimpaired Claims under the Plan, it is not relevant for Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 5 (General Unsecured Claims).

---

[100]   *Id.* § 1129(a)(6).

[101]   *Id*. § 1129(a)(7).

[102]   *See Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (stating that, under section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court is required to determine whether impaired claims would receive no less under a plan than through a liquidation); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

Therefore, the best interests test is deemed satisfied for all members of the Classes of Unimpaired Claims.

96.    Here, the best interests test is satisfied with respect to the Holders to which it applies:  the Holders of Claims in Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims), Holders of Claims in Class 8 (Existing Equity Interests)—who are deemed to have rejected the Plan—and Holders of Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) who are deemed to have rejected or conclusively presumed to have accepted the Plan.[103]   As set forth in the Khoo Declaration, A&M, in collaboration with the Debtors' management, performed the Liquidation Analysis that was attached as Exhibit E to the Disclosure Statement.[104]   Subject to the assumptions and qualifications contained therein, the Liquidation Analysis establishes that all Holders of Claims and Interests in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount greater than or equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[105]

97.    The Debtors' Liquidation Analysis is sound, reasonable, and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and claims, including assumptions that the Debtors initiate proceedings under chapter 7 of the Bankruptcy Code on or about December 30, 2025, cease all material operations as of that date, and spend the next four-month period facilitating piecemeal sales of the Debtors' available property, which is the primary source of value to creditors in this scenario.[106]   The assumptions and estimates in the

---

[103]    *See* Khoo Decl. ¶ 12.

[104]    *See generally id.*

[105]    *See* Liquidation Analysis; Khoo Decl. ¶ 17.

[106]    *See* Khoo Decl. ¶¶ 14–15.

Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the collective knowledge and expertise of the Debtors' management and advisors, all of whom have intimate knowledge of the Debtors' business and relevant industry or restructuring experience.[107]  Based on the foregoing, the Plan satisfies the requirements of the best interests test under section 1129(a)(7) of the Bankruptcy Code.[108]

### 8.    Section 1129(a)(8):  The Plan Has Been Accepted by Each Impaired Voting Class

98.    Section 1129(a)(8) of the Bankruptcy Code requires the following:  "[w]ith respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."[109]  As reflected in the Voting Report, the voting results indicate that each of the Voting Classes (Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims)) has voted to accept the Plan.[110]  More particularly, the Debtors received votes in favor of the Plan from (a) 100% in amount of the Class 3 First Lien Claims and (b) 100% in amount of the Class 4 Picea HK Supply Agreement Claims.[111]  Class 8 (Existing Equity Interests) is deemed to reject the Plan, and Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) are conclusively presumed to accept or deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.  As discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code, and thus, are able to "cram-down" Classes 6, 7, and 8 under section 1129(b) of the Bankruptcy Code notwithstanding the ostensible requirements of section 1129(a)(8).

---

[107]    *See id*. ¶ 13.

[108]    *See id*. ¶ 18.

[109]    11 U.S.C. § 1129(a)(8).

[110]    Voting Report, Ex. A.

[111]    *Id*.

### 9. Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims

99. Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.[112]  The Plan provides that, except as otherwise agreed with the relevant Holder of such Claims, Allowed Administrative Claims and Allowed Other Priority Claims (which exclude Priority Tax Claims) will be paid in full in Cash on the Effective Date, and Allowed Priority Tax Claims shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code and, to the extent that an Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holders of such Claim, or as may be due and payable under applicable nonbankruptcy law, or in the ordinary course of business by the Reorganized Debtors.  Accordingly, the Plan complies with section 1129(a)(9)(A)– (C) of the Bankruptcy Code.[113]

### 10. Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

100. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of Impaired Claims, "determined without including any acceptance of the plan by any insider."[114]  As set forth in the Voting Report, Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims) are Impaired and accepted the Plan, without

---

[112]   11 U.S.C. § 1129(a)(9).

[113]   *See* Plan, Art. II.

[114]   11 U.S.C. § 1129(a)(10).

including the acceptance of the Plan by any insiders in such Class.[115]    Accordingly, the Plan

satisfies section 1129(a)(10) of the Bankruptcy Code.

### 11.    Section 1129(a)(11):  The Plan Is Feasible

101.    Section 1129(a)(11) of the Bankruptcy Code requires the court to determine that a

plan is feasible, and that "[c]onfirmation of the plan is not likely to be followed by [a] liquidation,

or the need for further financial reorganization."[116]    The feasibility inquiry is fact-intensive and

requires a case-by-case analysis, but has a relatively low threshold of proof necessary to satisfy

the feasibility requirement.[117]    To demonstrate that a plan is feasible, a plan proponent only has to

show reasonable assurance of commercial viability, not provide a guarantee of success.[118]    Instead,

courts will find that a plan is feasible if a debtor demonstrates a reasonable assurance that

consummation of the plan will not likely be followed by a further need for financial reorganization.

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which

promise creditors and equity security holders more under a proposed plan than the debtor can

possibly attain after confirmation."[119]    Therefore, the Court need only determine that "the plan has

a reasonable likelihood of success."[120]

---

[115]    Voting Report, Ex. A.

[116]    11 U.S.C. § 1129(a)(11).

[117]    *See Mercury Cap. Corp.* v. *Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting *In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003))).

[118]    *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012) (finding that a court "need not require a guarantee of success, but rather only must find that the plan presents a workable scheme of organization and operation from which there may be reasonable expectation of success") (internal citations omitted); *see In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (observing that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks omitted).

[119]    *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted).

[120]    *See Kane* v. *Johns-Manville Corp.*, 843 F.2d 636, 649–50 (2d Cir. 1988); *see also In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding a plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan").

102.    In assessing feasibility, courts consider the following factors, among others:  (a) the adequacy of the capital structure; (b) the earning power of the business; (c) the economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other matter that determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[121]

103.    Here, the Financial Projections attached to the Disclosure Statement demonstrate that the Plan is feasible and that the Reorganized Debtors are expected to have sufficient earnings to meet their obligations under the Plan.   The Financial Projections were integral to the development of the Valuation Analysis and are based on assumptions, including as to:  (a) timely Confirmation and Consummation pursuant to the terms of the Plan; (b) the anticipated future performance of the Reorganized Debtors; (c) industry performance; (d) general business and economic conditions; and (e) other matters or circumstances, many of which are beyond the control of the Debtors, and some or all of which may not materialize.[122]  As demonstrated in the Financial Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan and satisfy obligations related to their post-emergence business operations in the ordinary course of business.[123]  The Financial Projections show that the Debtors will emerge with a deleveraged balance sheet with no funded debt or related interest expense, materially improved supply arrangements, and the liquidity necessary to execute on their business

---

[121]    *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 298; *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *58 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Prudential Energy Co.*, 58 B.R. 857, 862–63 (Bankr. S.D.N.Y. 1986).

[122]    *See* Financial Projections at 3–7.

[123]    *Id.* at 1-2, 7-8; Wong Decl. ¶ 39.

plan.[124]   Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.[125]

104.    Furthermore, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholder.  The Debtors' key stakeholder extensively reviewed the Financial Projections and the business plan, which ultimately resulted in the terms incorporated into the Plan.[126]  The Plan contemplates a comprehensive restructuring that will allow the Debtors to emerge from these Chapter 11 Cases with no funded debt and the necessary liquidity to execute on their business plan.[127]  Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

### 12.    Section 1129(a)(12):  All Statutory Fees Have or Will Be Paid Under the Plan

105.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under section 1930 of title 28 of the United States Code, which are afforded priority as administrative expenses.[128]  In accordance with these requirements, the Plan provides that all such fees due and payable before the Effective Date shall be paid by the Debtors or the Reorganized Debtors, as applicable, for each quarter (including any fraction thereof), until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[129]  The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

---

[124]   *See* Financial Projections at 7, 8; Wong Decl. ¶ 39.

[125]   *See* Financial Projections at 1; Wong Decl. ¶ 39.

[126]   *See* Wong Decl. ¶ 39.

[127]   *See Id.*

[128]   11 U.S.C. §§ 507(a)(2), 1129(a)(12).

[129]   *See* Plan, Art. XII.C.

53

### 13.    Section 1129(a)(13):  The Plan Does Not Modify Retiree Benefits

106.    Section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for the continuation, after the Effective Date, of all retiree benefits.[130]  The Plan does not modify any retiree benefits provided by the Debtors within the meaning of section 1114 of the Bankruptcy Code, and pursuant to Article IV.Q of the Plan, any such retiree benefits shall continue to be paid in accordance with applicable law.[131]    Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

### B.    Section 1129(b):  The Plan Satisfies the "Cram-Down" Requirements

107.    Under section 1129(b)(1) of the Bankruptcy Code, the court may "cram-down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors or equity holders that rejects a plan.[132]  Accordingly, a dissenting holder in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.[133]

108.    As discussed above, the Holders of Claims in the Voting Classes (Class 3 (First Lien Claims) and Class 4 (Picea HK Supply Agreement Claims) voted to accept the

---

[130]    11 U.S.C. §§ 1114, 1129(a)(13).

[131]    *See* Plan, Art. IV.Q.

[132]    *See* 11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan." (emphasis added)).

[133]    *See In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 426 (2d Cir. 2008) ("[A] plan need not satisfy the Absolute Priority Rule so long as any class adversely affected by the variation accepts the plan . . . ."); *Johns-Manville Corp.*, 843 F.2d at 650 (refusing to consider objection of dissenting creditor in accepting class because section 1129(b) did not need to be satisfied as to an accepting class); *Jersey City Med. Ctr.*, 817 F.2d at 1062 (overruling cram-down objection because objecting party was a member of an accepting class and therefore section 1129(b)(1) afforded no protection to such party).

Plan.[134]  Accordingly, cram-down is only relevant to Class 8 (Existing Equity Interests), which is deemed to reject the Plan, and Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), which are conclusively presumed to accept or deemed to reject the Plan.  The Plan may be confirmed as to each of these Classes pursuant to the cram-down provisions of section 1129(b) of the Bankruptcy Code.

### 1.     The Plan Does Not Discriminate Unfairly

109.    The Bankruptcy Code does not provide a standard for determining "unfair discrimination."[135]  Courts instead examine the facts and circumstances of the particular case to determine whether there is unfair discrimination.[136]  The unfair discrimination requirement ensures that similarly situated creditors and interest holders do not receive materially different treatment under a proposed plan without a compelling justification.[137]

110.    The Plan does not discriminate unfairly with respect to any potential rejecting Class.  There is no unfair discrimination among Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), or Class 8 (Existing Equity Interests).

---

[134]   *See* Voting Report, Ex. A.

[135]   *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds, Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis . . ."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[136]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 157 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination, including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs. Ltd. P'ship.*, 621 B.R. 330, 375–77 (Bankr. D.N.J. 2020) (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied).

[137]   *See Greate Bay Hotel*, 251 B.R. at 228 (noting that one of the "[t]he hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . ."); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd sub nom.* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane* v. *Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

111.    Claims in Class 6 (Intercompany Claims) and Interests in Class 7 (Intercompany Interests) are entirely unique from Claims or Interests in any other Class, and, therefore, are appropriately placed in their own Classes.    The Debtors separately classified Intercompany Claims from other Claims, and Intercompany Interests from other Interests, in order to preserve the option to, as applicable, reinstate, set off, settle, distribute, contribute, merge, cancel, or release such Claims and Interests.  Such treatment allows for greater flexibility for the Debtors to determine whether it is more efficient to maintain their organizational structure when they are implementing the Restructuring Transactions.  Importantly, this optionality does not affect any stakeholders' recovery under the Plan, including General Unsecured Claims, which are Unimpaired under the Plan, and is intended only for administrative convenience in the restructuring process.

112.    Interests in Class 8 (Existing Equity Interests) are also legally distinct in nature from all other Classes, as they represent the ultimate equity Interests held by third parties in Debtor iRobot    Corporation.      All    other    Debtors    are    wholly    owned    subsidiaries    of Debtor iRobot Corporation.[138]  All Interests in Debtor iRobot Corporation are classified together and afforded the same treatment under the Plan.  Class 8 therefore represents legally distinct Interests from Class 7.

113.    Thus, the Plan does not "discriminate unfairly" with respect to any Impaired Classes of Claims or Interests.

### 2.    The Plan Is Fair and Equitable

114.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under

---

[138]    *See* Wong Decl. ¶ 44.

56

the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[139]   In other words, a plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan if it follows the "absolute priority" rule.[140]   The absolute priority rule mandates that a junior class of claims or interests cannot receive a distribution under the plan on account of such claims or interests unless senior classes are rendered unimpaired or give their consent.[141]   Additionally, in order for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claims).[142]

115.    There is no class junior to Class 8 (Existing Equity Interests), and thus no possible violation of the "fair and equitable" rule with respect to such Class.  The "fair and equitable" rule is likewise satisfied as to the other Classes that may be deemed to reject the Plan (*i.e.*, Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests)).  To the extent Classes 6 and 7 receive a recovery, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  Rather, it is simply to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule, and the unimpairment of such Claims and Interests, if any, affects neither

---

[139]   *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[140]   *See id.* § 1129(b); *203 N. LaSalle*, 526 U.S. at 441–42.

[141]   *See* 11 U.S.C. § 1129(b).

[142]   *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

the economic substance of the Plan, nor any recoveries to the Debtors' creditors.[143]  Furthermore, no Claims and Interests junior to each such Class, as applicable, will receive or retain any property under the Plan on account of such junior Claims or Interests.  Further, as set forth in Article III of the Plan, no Class of Claims or Interests is being paid more than it is owed.[144]

116.    Accordingly, because the Plan does not discriminate unfairly and is fair and equitable, the Plan satisfies the "cram-down" requirements of section 1129(b) of the Bankruptcy Code and may be confirmed.

### C.    Section 1129(c):  The Plan Is the Only Plan Currently on File

117.    The Plan is the only plan filed in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

### D.    Section 1129(d):    The Purpose of the Plan Is Not Tax or Securities Law Avoidance

118.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no governmental unit has objected to Confirmation of the Plan on such grounds.    The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### E.    Section 1129(e):  Does Not Apply to the Plan

119.    The provisions of section 1129(e) of the Bankruptcy Code apply only to a "small business case."  These Chapter 11 Cases are not a "small business case," and, accordingly, section 1129(e) is not applicable to the Plan.

---

[143]    *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 47–48 (Bankr. D. Del. 2000) (holding that "the retention of the corporate structure among the Debtors will not adversely affect any creditors" and does not violate the absolute priority rule); *In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[144]    *See* Plan, Art. III.

### III.    Good Cause Exists to Waive the Stay of the Confirmation Order

120.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).   Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each Bankruptcy Rule also permits modification of the imposed stay upon court order.

121.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[145]    The restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties and is premised on the Reorganized Debtors emerging from the Chapter 11 Cases as soon as reasonably possible.[146] That restructuring contemplates a series of corporate steps that must be completed on the Effective Date, including the issuance of the New Common Equity.  Given that time is of the essence, immediate effectiveness of the Confirmation Order would facilitate the Debtors' efforts to take the steps necessary to consummate the Plan by the Effective Date.  Additionally, no party in interest has raised a formal objection to confirmation of the Plan and there are no expected appeals of the Confirmation Order.

122.    Finally, as set forth above, given the Debtors' extensive efforts to provide each of the solicited parties, as well as their other stakeholders, a full measure of adequate notice, staying

---

[145]    *See, e.g.*, *In re Maremont Corp.*, 601 B.R. 1, 116 (Bankr. D. Del. 2019) (waiving stay of enforcement, including pursuant to Bankruptcy Rule 3020(e)).

[146]    Wong Decl. ¶ 61.

the Confirmation Order will not serve any due process-related ends.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## Conclusion

123.   For all of the reasons set forth herein and in the Supporting Declarations, and as will be further demonstrated at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order and granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank.*]

60

Dated: January 20, 2026
    Wilmington, Delaware

Respectfully submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
Shella Borovinskaya (No. 6758)
Kristin L. Cardoza (No. 6871)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: sgreecher@ycst.com
amagaziner@ycst.com
sborovinskaya@ycst.com
kcardoza@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
John T. Weber (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
jweber@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Response Chart**

**Summary Chart of Informal Comments**

| Party in Interest | Resolved / Unresolved | Summary of Comment | Debtors' Response |
|---|---|---|---|
| U.S. Trustee | Resolved | The U.S. Trustee requested clarification that the Debtors' "fiduciaries" included in the definition of "Exculpated Parties" only include the Debtors' retained professionals at any time between the Petition Date and Effective Date. | The Debtors resolved this comment in the modified Plan by revising the definition of "Exculpated Parties". *See* Article I.44 of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested clarification that each Holder of an Unimpaired Claim shall retain all rights under applicable non-bankruptcy law to pursue its Unimpaired Claim and be entitled to enforce its rights in respect of such Unimpaired Claims until such Unimpaired Claims have been paid in full or otherwise disposed of. | The Debtors resolved this comment in the modified Plan by revising Articles VI.A and C. *See* Articles VI.A and C of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested clarification that the Debtors shall use commercially reasonable efforts to determine a Holder's then-current address if a distribution is returned as undeliverable. | The Debtors resolved this comment in the modified Plan by revising Article VII.E.3. *See* Article VII.E.3 of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested clarification that prior to the Effective Date Holders of Claims shall receive no less than 10 days' written notice of a proposed setoff or recoupment on account of such Claims and if any such Holder timely objects to the proposed setoff or recoupment, such setoff or recoupment may not be effectuated without prior approval of the Court. | The Debtors resolved this comment in the modified Plan by revising Article VII.K. *See* Article VII.K of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested that references to Bankruptcy Rule 9019 and "settlement and compromise" in connection with the Debtor Release and Third-Party Release be removed on account of the US. Trustee's position that the Plan is not a settlement and compromise notwithstanding that Holders of Claims and Interest must opt-in to the releases provided by the Plan. | The Debtors resolved this comment in the modified Plan by revising Articles VIII.C and D. *See* Articles VIII.C and D of the Plan. |

| Party in Interest | Resolved / Unresolved | Summary of Comment | Debtors' Response |
|---|---|---|---|
| U.S. Trustee | Resolved | The U.S. Trustee requested clarification that the United States District Court for the District of Delaware has concurrent jurisdiction with the Court. | The Debtors resolved this comment in the modified Plan by revising Article VIII.F. *See* Article VIII.F of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested that Article VIII.G of the Plan be removed and the Releasing Parties not be required to waive statutory limitations on releases. | The Debtors resolved this comment in the modified Plan by revising Article VIII.G such that it is only applicable to parties to the Restructuring Support Agreement. *See* Article VIII.G of the Plan. |
| U.S. Trustee | Resolved | The U.S. Trustee requested the inclusion of the U.S. Trustee's preferred language with respect to the payment of Quarterly Fees and preparation of monthly operating reports. | The Debtors resolved this comment in the modified Plan by revising Article XII.C. *See* Article XII.C of the Plan. |
| Oracle America, Inc. ("Oracle") | Resolved | Oracle requested confirmation (i) of the amount to be paid by the Debtors on account of any prepetition Cure Claim associated with Oracle's agreements and (ii) that any other obligations accruing after the Petition Date owed to Oracle shall be paid in the ordinary course of business. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 111. |
| Lexon Insurance Company ("Lexon") | Resolved | Lexon requested clarification regarding the treatment of the Debtors' surety bonds issued by Lexon under the Plan. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶¶ 112-114. |
| Atlantic Specialty Insurance Company ("Atlantic Specialty") | Resolved | Atlantic Specialty requested clarification regarding the treatment of the Debtors' surety bonds issued by Atlantic Specialty under the Plan. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 115. |